18TH JUDICIAL DISTRICT COURT FOR THE PARISH OF IBERVILLE

STATE OF LOUISIANA

DOCKET NO.                                                DIV. "B"

16225                    CURTIS D. MORGAN

VERSUS

DOW CHEMICAL COMPANY, ET AL

FILED: _____          _____
                                              DEPUTY CLERK

## PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes Plaintiff, Curtis D. Morgan, who respectfully offers the allegations that follow:

1.    Plaintiff Curtis D. Morgan is an adult resident citizen of the State of Louisiana, residing at 41570 River Road, Ponchatoula, LA 70454.

2.    The plaintiff was exposed to asbestos during his work at various jobsites identified in Exhibit "A" so venue is proper in this parish pursuant to La. Code of Civil Procedure article 74 as the parish where the wrongful conduct occurred and where damages were sustained.

3.    Defendants, The Dow Chemical Company and Syngenta Crop Protection, LLC, are foreign corporations with their principal place of business in Louisiana located in Iberville Parish.  Plaintiff was exposed to products, distributed and installed by the above-referenced defendants at the work sites in Exhibit "A".  Plaintiff specifically alleges that these products, in combination with other asbestos-containing products, caused his asbestos-related injuries.

4.    Each of the defendants listed in the Exhibits attached hereto, contributed with The Dow Chemical Company and Syngenta Crop Protection, LLC, to Plaintiff's exposure to asbestos at his work sites, including but not limited to, the exposure sites located on Exhibit "A".  Each of these defendants is liable in solido, with The Dow Chemical Company and Syngenta Crop Protection, LLC, to the Plaintiff.  Thus, venue proper for these defendants is proper for all defendants pursuant to Louisiana Code of Civil Procedure articles 42 and 73.

5.    The Defendants (hereinafter collectively referred to as "asbestos defendants"), are all corporations incorporated under the laws of the various states of the United States. Asbestos defendants all have their principal place of business in various states of the United States. All of

1



them may be served under and by virtue of the Long Arm Statute of the State of Louisiana, through their authorized agents, servants, and/or employees, or through the Secretary of State, State of Louisiana.

6.    At all material times herein, James Bull, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, Edward Blanchard, Ewing Moore, Roy Barkdull, Peter Territo, Dr. Joseph Mabey, J. Melton Garrett, and Albert Bossier, Jr. were executive officers of HUNTINGTON INGALLS INCORPORATED f/k/a NORTHROP GRUMMAN SHIPBUILDING, INC., and f/k/a AVONDALE INDUSTRIES, INC., f/k/a AVONDALE SHIPYARDS, INC.) (hereinafter sometimes "Avondale" or "Avondale Industries, Inc.") with the specific responsibility for the health and safety of Curtis D. Morgan and his fellow employees during the time Curtis D. Morgan was exposed to substances which resulted in his asbestos-related mesothelioma and other ill effects related thereto. James Bull, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, Edward Blanchard, Ewing Moore, Roy Barkdull, Peter Territo, Dr. Joseph Mabey, and J. Melton Garrett have since died, and pursuant to Louisiana Revised Statute 22:1269, plaintiffs herein assert a direct action against American Motorists Insurance Company, American Employer's Insurance Company, and OneBeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), who, at all times material herein, were the insurance carriers covering all of the foregoing individuals as well as Avondale, Industries, Inc. for the liability asserted herein. These executive officers and Avondale were also insured by Highlands Insurance Company for the liability asserted herein, and plaintiffs assert a claim against Avondale for this liability pursuant to a buy-back contract and agreement. As stated above, Albert Bossier, Jr., was also an executive officer of Avondale with specific responsibilities for the health and safety of Curtis D. Morgan and his fellow employees. He too was covered for the liability asserted herein by Highlands Insurance Company, American Motorists Insurance Company; American Employer's Insurance Company, and OneBeacon America Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company); and Travelers Indemnity Company. Plaintiff asserts a direct action against American Motorists Insurance Company, American Employer's Insurance Company, and OneBeacon America

Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), for the liability of this individual pursuant to the Louisiana Direct Action Statute. Likewise, this executive officer was also insured by Highlands Insurance Company for the liability asserted herein, and plaintiffs assert a claim against Avondale for this liability pursuant to a buy-back contract and agreement.

7.     Under a buy-back contract  and agreement between Northrop Grumman Shipbuilding, Inc., (formerly Northrop Grumman Ship Systems, Inc., formerly Avondale Industries, Inc., and formerly Avondale Shipyards, Inc.) (hereinafter "Avondale") and Highlands Insurance Company (currently in receivership), Avondale is an additional insurer under the Highlands Insurance Company policies providing coverage to Avondale and its executive officers and employees for the liability asserted in plaintiffs' petition. The plaintiffs assert an action against Avondale pursuant to this contract and agreement pursuant to La. Civil Code articles 1821-1823.

8.     Under a buy-back contract and agreement between Avondale and American Motorists Insurance Company, Avondale is an additional insurer under the American Motorists Insurance Company policies providing coverage to Avondale and its executive officers and employees for the liability asserted in plaintiffs' petition. The plaintiffs assert an action against Avondale pursuant to this contract and agreement pursuant to La. Civil Code articles 1821-1823.

9.     Curtis D. Morgan was employed in various positions by and on the premises of Avondale Industries, Inc. On a daily basis during this employment, Curtis D. Morgan was exposed to dangerously high levels of toxic substances, including asbestos, and asbestos-containing products sold, manufactured, and/or distributed by the "asbestos defendants" in the normal routine course of his work.

10.    As a result of these exposures to toxic substances, including asbestos, Curtis D. Morgan contracted asbestos-related mesothelioma and other related ill health effects, which were first diagnosed on approximately December 21, 2016.

11.    Avondale and its executive officers had the responsibility of providing Curtis D. Morgan with a safe place to work and safety equipment with which to conduct his work (including disposable overalls and showers); however, they negligently and/or intentionally failed to carry out these duties and failed to protect Curtis D. Morgan from the dangers of toxic fiber and dust exposure, and failed to protect family members from said exposures to asbestos and toxic fiber.

12.    Avondale and its executive officers were aware or should have been aware of the dangerous conditions presented by exposure to asbestos and other toxic substances, and that Curtis D. Morgan (and other similarly situated employees and/or family members of its working force) would suffer from asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects as a result of this exposure, but they failed and/or willfully withheld from Curtis D. Morgan knowledge of the dangers to their health from exposure to asbestos fiber and other toxic substances.

13.    In addition to the foregoing acts of negligence and intentional concealment, Avondale and its executive officers are guilty of the following:

> (a) Failing to reveal and knowingly concealing critical information from Curtis D. Morgan, including the ability to expose family members to asbestos through clothing of its workers;
>
> (b) Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process;
>
> (c) Failing to provide necessary protection to Curtis D. Morgan, as well as to other employees and family members;
>
> (d) Failing to provide clean, respirable air and proper ventilation;
>
> (e) Failing to provide protective or disposable clothing and showers to its employees so that asbestos fiber would not be brought home to family members;
>
> (f) Failing to advise employees that deadly asbestos fiber could be brought home to their family members; and
>
> (g) Wanton and reckless disregard in the storage, handling, and transportation of asbestos;
>
> (h) Requiring employees to dump asbestos into the Mississippi River instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;
>
> (i) Requiring employees to dispose of asbestos in dumpsters instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;
>
> (j) Requiring employees to dispose of asbestos under buildings instead of properly disposing of asbestos and asbestos fiber, thereby further exposing

4

employees (and subsequently their family members) to asbestos;

(k) Failing to warn of the dangers of exposure to asbestos;

(l) Failing to warn employees and their families that asbestos fiber could be brought home on clothing and other objects, could expose innocent family members, and could cause deadly diseases to family members including mesothelioma, lung cancer, asbestosis, pleural thickening, and pleural plaques;

(m) Failing to warn employees of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, pleurisy, diagphragmatic calcifications, cancer, and mesothelioma;

Avondale and its executive officers intentionally or negligently committed these acts knowing full well that Curtis D. Morgan's injuries would follow or were substantially certain to follow.

14.    Avondale and its executive officers, James Bull, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, George Kelmell, John Chantrey, Ollie Gatlin, Earl Spooner, James T. Cole, Hettie "Dawes" Eaves, Burnette "Frenchy" Bordelon, Steven Kennedy, Edward Blanchard, John McQue, Ewing Moore, Peter Territo, Roy Barkdull, Dr. Joseph Mabey, J. Melton Garrett, and Albert Bossier, Jr., were aware or should have been aware of the dangerous condition presented by exposure to asbestos and other toxic substances, and that said substances could be carries home by employees, and that employees and their family members would suffer from asbestos-related pulmonary disease, asbestos, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects as a result of this exposure, but they failed and/or willfully withheld from Curtis D. Morgan knowledge of the dangers to one's health from exposure to asbestos fiber and other toxic substances.

15.    In addition to acts of negligence, strict liability, intentional tort, and fault identified throughout this petition, Avondale is strictly liable under a theory of premises liability. Avondale was aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that Curtis D. Morgan would be exposed to asbestos and that Curtis D. Morgan would suffer from asbestos-related disease and other ill health effects associated therewith as a result of these exposures, but they failed and/or willfully withheld from Curtis D. Morgan

knowledge of the dangers to his health from exposure to asbestos fiber.

16.    Defendants, OneBeacon American Insurance Company (as successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company), American Employers Insurance Company, and American Motorists Insurance Company, knew or should have known of the hazardous health effects of asbestos, but failed to inform or intentionally concealed that information from Curtis D. Morgan, and his co-employees as well as from his family members.

17.    All defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Curtis D. Morgan, and for which these defendants are strictly liable under Louisiana Law.

18.    Defendant, Avondale, was the owner of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Curtis D. Morgan, and for which defendant is strictly liable under Louisiana Law.

19.    Defendant, Avondale, is answerable for the conduct of those handling asbestos products on their premises, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury to Curtis D. Morgan, and for which defendant are strictly liable under the Louisiana Law.

20.    Defendant, Avondale, is responsible for the conduct of those individuals and companies working on their premises with asbestos products which resulted in exposure to asbestos to Curtis D. Morgan, which asbestos was defective and which presented an unreasonable risk of harm, and which asbestos resulted in the injury to Curtis D. Morgan, and for which defendants are strictly liable under Louisiana Law.

21.    At all times herein, Curtis D. Morgan, was exposed to asbestos manufactured, distributed, and sold by Hopeman Brothers, Inc. and Wayne Manufacturing Company. The asbestos-containing products manufactured, distributed and/or sold by Hopeman Brothers, Inc. and Wayne Manufacturing Company were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, these defendants failed and refused to warn Curtis D. Morgan, of the danger of exposure to such products. They also failed to warn them of the invisible nature of the asbestos and that it could cause deadly diseases such as mesothelioma and cancer. As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured,

distributed, and/or sold by these "asbestos defendants," Curtis D. Morgan was exposed to asbestos fibers proximately causing him asbestos-related mesothelioma, and other related ill health effects. Plaintiff further contends that said defendants are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and or failing to provide adequate warnings and instructions. Further, defendants are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

22.   During Curtis D. Morgan's exposure, Hopeman Brothers, Inc. also performed contracting work wherein asbestos-containing products were used. During this contracting work, Hopeman Brothers, Inc. exposed Curtis D. Morgan to asbestos-containing products, which caused and/or contributed to Curtis D. Morgan's asbestos-related diseases and other related ill health effects from which he suffers. Defendant, Hopeman Brothers, Inc. had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Curtis D. Morgan, and for which Hopeman Brothers, Inc. is strictly liable under Louisiana Law. Moreover, defendant, Hopeman Brothers, Inc. is answerable for the conduct of those handling asbestos products over which it had control, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Curtis D. Morgan and for which defendant is strictly liable under Louisiana Law.

23.   In addition to the aforementioned acts of negligence, international tort, fraud, and strict liability, of Hopeman Brothers, Inc. and Wayne Manufacturing Co., Hopeman Brothers, Inc. is also liable because Wayne Manufacturing Corporation was the alter ego of Hopeman Brothers, Inc. at all-time material herein.

24.   Plaintiffs also make additional allegations against Hopeman Brothers, Inc. who was aware of the risk of harm presented by its asbestos products. Hopeman Brothers, Inc. either through exchange of information and/or industry sponsored studies was notified, either directly by its parent companies or by its manufacturing associations, that their products presented an unreasonable risk of harm. However, Hopeman Brothers, Inc. disregarded these notices, elected to conceal these hazards from the Curtis D. Morgans and continued to use and hold out these products as safe and non-toxic.

25.   Hopeman Brothers, Inc. was informed that asbestos dust presented health risks by

the U.S. Government or agencies acting on behalf of the U.S. Government no later than 1945. The U.S. Government issued advisories, through the U.S. Maritime Commission, to all government contractors regarding their findings of enumerated health risks in the work place. During the 1950s, the Department of Defense adopted and distributed to all government contractors, safety standards that pertained to the use of the defendants' products in various work places. In 1958, Louisiana adopted a workers compensation remedy for asbestosis. In the 1960s, the U.S. Government promulgated and published the Walsh-Healy Act which adopted safety standards and regulations regarding asbestos dust. Based on information and belief, Hopeman Brothers, their predecessor, and corporation officers were made aware of these findings at the time they were issued. Despite this knowledge Hopeman continued to manufacture, distribute, relabel, fabricate, sell and install these products at Curtis D. Morgan's worksites. This was done without warning to Curtis D. Morgan and without the knowledge on the part of the Curtis D. Morgan that he was in danger. Additionally, these defendants continued to market their products without disclosing the dangers and simultaneously affirming that their products were safe and non-toxic.

26. During Curtis D. Morgan's exposure, defendant, Westinghouse Electric Corporation (now CBS Corporation, hereinafter "Westinghouse"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Curtis D. Morgan, and/or to the owners of the premises where he worked, throughout his entire employment history at Avondale. Such products were installed, removed, and repaired by or in close proximity to Curtis D. Morgan during his employment, thus exposing him to asbestos dust released by the installation, removal and repair of said products. Throughout the time that Curtis D. Morgan was employed, he was exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by Westinghouse. At the time he was exposed to these products, the products were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of Westinghouse.

27. The asbestos-containing products manufactured, distributed and/or sold by Westinghouse were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, Westinghouse failed and refused to warn Curtis D. Morgan of the danger of exposure to said products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer,

asbestosis, and mesothelioma.

28.    Plaintiffs further allege that Westinghouse has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

29.    By the early 1940s, Westinghouse knew that exposure to asbestos could cause lung disease, asbestosis, lung cancer, and mesothelioma. Throughout the 1930s, 1940s and 1950s, Westinghouse was a member of the IHF, American Ceramic Society and National Safety Council. Beginning in the 1930s, Westinghouse received asbestos scientific and medical information through these organizations.

30.    The "Air Hygiene Foundation", was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh). The organizations' name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health Foundation." J-M joined in 1936. IHF members included, among others, general Electric Company and Westinghouse Electric Corporation, or their predecessors in interest. All of these companies are defendants in this case. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the functions of the IHF was to gather and disseminate information regarding occupational health to its members. Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins and engineering bulletins. Since 1937, member companies have been kept informed on occupational health issues by the Industrial Hygiene Digest, a monthly publication which is sent to all members in return for their annual membership fee. The Digest is a compilation of abstracts, grouped by topic of the published domestic and foreign scientific and medical literature pertaining to industrial health and hygiene. In addition to scientific abstracts, the digest included a section on legal developments, and also provided notice of any proposed changes in threshold limit values for various substances. Correspondence between members and the IHF established that members either participated in or knew of a number of studies and surveys dating as far back as the 1930s which had linked asbestos with various lung diseases. As part of its consultative services for its members, the IHF undertook a number of studies involving evaluations of asbestos dust conditions and asbestos-related disease. In 1947, the fruits of an industry survey conducted by the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for Asbestos Textile Institute." The report is dated June 1947. The object of the investigation was

9

stated as: "defining the specific nature and the magnitude of the (asbestosis) problem in all its phases....An original Objective of most immediate importance was to facilitate the exchange of information between member companies on successful methods of dust control and otherwise to promote a general improvement in that field." The preliminary survey to be divided into three parts designated as "Engineering, Medical and Physical Testing" was based on visits made to member companies' plants over a three month period." While the actual report does not reveal the identity of the plants which were visited, deposition testimony of Dr. Braum indicates that other companies evaluated in the report included, among others, Garlock. Minutes of the Air Hygiene Committee meetings throughout the 1940s and 1950s reflect frequent discussions and presentations pertaining to the appropriate medical practices and industrial hygiene approaches to the problem of asbestos dust in the work place. It was continually stressed that both pre-employment and periodic follow-up medical examinations were essential to monitor the health of employees, the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of asbestos-related disease. Some annual meetings apparently were held by the IHF. The minutes for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest. An Interim Report of the Preventative Engineering Committee, written by Philip Drinker, discussed inter alia dust particle size and dust control. A second report by Foundation Research at the Saranac laboratory entitled "Individual Susceptibility to Toxic Dusts", authored by Dr. Leroy Gardner, dealt primarily with the problem of silica dust. Also discussed were court decisions on Workers' Compensation cases. A case involving the death of a North Carolina man was discussed, the minutes indicating that the claimant sought compensation on grounds that the defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also recommended that pre-employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that various procedures be implemented to reduce the dust in manufacturing facilities. IN December of 1946, Mr. Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of the American Textile Institute (discussed infra) to respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member companies. It was agreed at the February 5, 1947 meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W.C.

10

L. Hemeon, head Engineer for IHF, stated that the medical review reflected an incidence of asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950) of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed to asbestos fiber. Defendants this had direct and actual knowledge that the suggested threshold limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

31.    In addition, Westinghouse and/or its medical director and industrial hygienist became members of the Konicide Club from 1932 through 1940. The Konicide Club was created to understand and control the dust related diseases in the industry, and the members would meet to discuss the methods of accomplishing these goals. On January 22, 1939, The Konicide Club even conducted a meeting which focused on the health problems of the asbestos industry in particular.

32.    Also, Westinghouse's industrial hygienist, E.C. Barnes, wrote to Westinghouse's medical department in the 1940s regarding the high dust levels associated with asbestos cloth and the mixing of asbestos cement. Barnes further explained that the inhalation of asbestos dust could cause asbestosis, and he recommended that this hazard be minimized. Westinghouse was also aware of the dust problems associated with the use of the asbestos cloth on turbines. However, from 1946 through the late 1970s, Westinghouse failed to control or reduce the dust created from the asbestos cloth, cement, and other asbestos components of its products at the various jobsites, and failed to warn with regard to these hazards.

33.    In 1953, Westinghouse produced its Asbestos Safe Practice Data Sheet, thus further evidencing Westinghouse's knowledge of the hazards associated with asbestos exposure. Also in 1953, Westinghouse acknowledged that it had a duty to warn contractors, who lacked that knowledge of potential hazards. However, Westinghouse still never warned the contractors nor the various jobsites of the hazards associated with exposure to asbestos.

34.    Westinghouse was also aware of the excessive dust produced from its Micarta product during the 1950s, as indicated in a letter from H.W. Speicher to James McClimans, a safety supervisor. In 1973, Westinghouse conducted dust studies at the Micarta facility and recorded high levels of airborne and settled asbestos-containing dust from the circular saw trimming of Micarta. Nevertheless, Westinghouse failed and refused to warn of health hazards of its asbestos-containing Micarta, and suppressed this information.

11

35. Additionally, Westinghouse knew that asbestos was dangerous in the 1940s and began a program to clean up the manufacturing process in their plants in the 1950s while continuing to manufacture asbestos-containing products. Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 until the mid-1970s. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products. Subsequent to this activity, Westinghouse learned though in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained product manufacturing information, air samples studies, architectural reports, work papers, old work files, and other similar materials. It was determined that all such documents be destroyed, despite Federal Regulations requiring their retention. This document destruction was done with the specific intention of defrauding asbestos victims and the courts before which Westinghouse would undoubtedly appear. In the past, Westinghouse has refused to respond to plaintiffs' request for the production of these documents principally on the basis that said documents did not exist due to their destruction. Accordingly, plaintiffs allege that Westinghouse's conduct constitutes fraud under Louisiana law.

36. Additionally, even when OSHA cited Westinghouse with willful, asbestos-related violations during the 1970s at its Hampton Micarta plant and in the 1980s at the Lester turbine and blanket plant. Regarding these incidents, Westinghouse's attorneys maintained that Westinghouse would not comply with either the EPA or OSHA and would take an attitude of "respectful noncompliance".

37. Westinghouse has engaged in a pattern of suppressing information with regard to its asbestos-containing products and the health hazards associated with same. Jeffrey J. Bair of Westinghouse states in what is known as "The Smoking Gun" documents that the Industrial Hygiene Department files, dating back to 1930, have been reviewed. After a general description of the categories of documents reviewed, Mr. Bair provides a discussion of the nature of these documents. The following are quotes from that discussion:

> The majority of the documents in Industrial Hygiene's files are potential "smoking gun" documents. This is so because of the nature, duties, obligations and responsibilities of the Industrial Hygiene Department. The

approximately 57 years of Industrial Hygiene files which are in existence today are filled with technical information, procedural information, safe-handling information, hazard information, recommendations and test results. The files are filled with documentation which critiques and criticizes, from an industrial hygiene perspective, Westinghouse manufacturing and non-manufacturing operations. This documentation often times points out <u>deficiencies</u> in Westinghouse operations and suggests recommendations to correct these deficiencies. Industrial Hygiene's files contain information which details the various chemical substances used at Westinghouse sites over the years, and often times the inadequacies in Westinghouse's use and handling of the substances. The files contain many years of employee test results, some of them unfavorable. Industrial Hygiene, by performing its job, creates, daily, potential <u>smoking gun documents</u> (emphasis added).

<u>Plant Correspondence and Files</u>

Please see, for example, Wilber Speicher's letter...correspondence of this type was and continues to be, frequently generated by Industrial Hygiene. Dr. Speicher's correspondence might show early knowledge of the Corporation to certain health hazards associated with epoxy resin dissolving agents. What use did the Corporation make of this knowledge to protect employees and the public? If none or very little, then this document might become a "<u>smoking gun</u>" (emphasis added).
Industrial Hygiene audit and trip reports certainly qualify as <u>potential smoking guns</u> (emphasis added). Industrial Hygiene, in each plant audit, critiques and criticizes the facility from an industrial hygiene perspective. Industrial Hygiene also makes recommendations to improve the hygiene of the plant. The <u>smoking gun possibilities</u> of such documentation are readily apparent (emphasis added). <u>Material Cards, Materials Safety Data Sheets, Purchasing [sic] Department Specification Cards, Safe Practice Data Sheets and Historical Safe Practice Data Sheet Files</u>

Again the <u>smoking gun</u> possibilities of these documents are clear. If, for example, the safe practices detailed in safe practice data sheets are not made a part of a site's industrial hygiene program and communicated to employees, the potential future problems are readily apparent. In addition, <u>if the information is not or was not conveyed to customers, the public, etc., again the potential future problems are readily apparent</u> (emphasis added).

<u>Recommendations</u>

<u>Plant Correspondence Files</u> (excluding air sampling data and employee test results such as bio-assay, radiation, etc.)

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic records retention guidelines to not specifically address these records. We recommend that all such files generated prior to 1974 should be discarded. As stated before, these records are filled with documentation dating back to the 1930's which critiques and criticizes Westinghouse operations, and points out deficiencies in such operations. The files are filled with technical product and chemical information, hazard information and safe-handling information, <u>most of it generated by the industrial Hygiene Department in a "editorializing" and opinionated manner</u>. The files are not used in the daily operation of the Department. In our opinion, the risks of keeping these files on the whole substantially exceed the advantages of maintaining the records for the following reasons:

The substantial bulk of the correspondence was written by the Department in an editorializing, opinionated and verbose manner, instead of strictly factual. In addition, the Industrial Hygiene Department, prior to 1974, was involved in testing and evaluating the safety of everything from water

coolers to gloves. From a review of the files, it appears that the Department commented and editorialized on just about everything which might have been found in the workplace. This "self-analysis" and "editorializing" type of information can be dangerous. This is just the type of documentation which should be discarded from the files. Correspondence generated subsequent to 1974, generally speaking, does not suffer from these drawbacks.

"Historical Files or Industrial Hygiene Department"

These records are not required pursuant to any federal, state or local laws and/or regulations. The Westinghouse domestic Records Retention Guidelines do not specifically address these records. We recommend that, with the exception of the 1974 noise survey and the testing date which is contained in these files, these files be discarded.

Bair's Conclusions

Toxic tort litigation, including toxic tort-related workmen's compensation litigation, show no signs of abating in the near future. In fact, legislation such as the risk notification legislation currently being considered by Congress, will, according to many "experts", result in an increase in such litigation. Consequently, well-reasoned and conceived document retention and destruction programs for departments such as Industrial Hygiene, and in fact the entire Corporation, are imperative.

Bair's conclusion clearly shows that Westinghouse fraudulently destroyed relevant documents all in furtherance of its fraudulent activities whereby it misrepresented the dangers of its asbestos-containing products in order to gain a commercial advantage, i.e., sell more of its dangerous products. More importantly, his conclusion shows that Westinghouse had motive for destroying the documents, which was **avoiding litigation** and having to answer fraud allegations therein.

38.   It is well settled that parties have a duty to preserve discoverable evidence, both during and prior to litigation, if it is reasonably foreseen that litigation will occur. Westinghouse knew litigation was likely to occur and destroyed their documents in anticipation thereof. This activity amounts to fraud and spoliation. In fact at least one court has already found that the activities set out in the Jeffrey Bair memo demonstrate a "plan to commit fraud on the Courts of the United States."

39.   The document destruction program set out in Bair's memo was actually implemented by Westinghouse, as is evidenced by a memorandum entitled "Document Retention" that was written by Wayne C. Bickerstaff on January 29, 1988, directed to J.W. Fisch and copied to S.R. Pitts and Jeffrey Bair. On March 3, 1988, Jeffrey Bair wrote another memo, indicating that he had "informed Wayne to begin discarding [certain documents]." These acts of intentional destruction of records by Westinghouse in order to avoid public knowledge that it had

knowledge of health hazards associated with its products constitute fraud under the laws of the State of Louisiana.

40.    During Curtis D. Morgan's exposure, defendant, General Electric ("GE"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Curtis D. Morgan, and/or to the owners of the premises where he worked, throughout his entire employment history at Avondale. Such products were installed, removed, and repaired by or in close proximity to Curtis D. Morgan during his employment thus exposing him to asbestos dust released by the installation, removal, and repair of said products. Throughout the time he was employed, Curtis D. Morgan was exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by GE. At the time of his exposure to these products, the products were being used in the manner and for the purpose in which they were intended; and these products were in the same condition as when they left the control and possession of GE.

41.    The asbestos-containing products manufactured, distributed and/or sold by GE were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, GE failed and refused to warn Curtis D. Morgan of the danger of exposure to said products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

42.    Plaintiff further alleges that GE has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

43.    Furthermore, as scientists became more concerned with the connection between asbestos and occupational exposure, General Electric, along with others in the asbestos industry, sponsored both animal and human research on the biological effects of asbestos at the Saranac Laboratory of the Trudeau Foundation. General Electric's association with the Saranac Laboratory extends at least to the 1940s, where Saranac Laboratory correspondence documents the contractual relationship between the Laboratory and General Electric. This research performed by the Saranac Laboratory revealed that exposure to asbestos produced harmful effects to those individuals who inhaled asbestos dust. More specifically, the Saranac Laboratory held the Seventh Saranac Symposium in 1952, whereupon General Electric representatives attended. The presentations by various doctors indicated that a link existed between asbestos and several lung diseases, including asbestosis and lung cancer.

15

44. In his presentation at the Seventh Saranac Laboratory in 1952, Dr. Kenneth M. Lynch indicated that he tested the effects of asbestos from a period of twenty-five years (1926-1950). The testing resulted in the knowledge of a causal relationship between asbestos and cancer in 1934. This discovery was formally set in a published record. Additionally, in 1947, Dr. Lynch discovered that 13.2% of persons suffering from asbestosis also developed cancer. Furthermore, Dr. Lynch spoke of several reports, dated from 1918 to 1952, discussing the association of cancer with asbestos.

45. Also, Dr. Merewether began noting the deaths from asbestos exposure in the United Kingdom during the years of 1924 to 1947, including asbestos with tuberculosis and asbestos with lung cancer. Dr. Merewether discovered that 16.2% of persons suffering from asbestosis also developed cancer, as opposed to the 13.2% found earlier, thus further indicating a causal relationship between exposure to asbestos dust and lung cancer. In addition, Dr. Merewether discussed the original cases of asbestosis discovered around 1902. Another doctor, Dr. Arthur J. Vorwald, discussed the discovery of asbestosis in the early 1900s and the availability of information concerning the disease through several reports, ever since. Dr. Vorwald also admitted that individuals exposed to asbestos fibers develop asbestosis. Thus, General Electric's attendance at the Seventh Saranac Symposium in 1952 indicates that it knew, or at least should have known, of the hazardous nature of asbestos in causing asbestosis and lung cancer. Despite this knowledge, General Electric failed to warn its workers and customers of the harmful effects that result from the inhalation of asbestos fibers.

46. General Electric contracted Harvard University to conduct research regarding the various hazards existing in their plants. Dr. Alice Hamilton, along with other Harvard medical doctors, conducted the research for General Electric. She recommended that chest x-rays be taken of all employees working with asbestos. She additionally recommended an overhaul in the ventilation system on certain apparatus at their plants due to the hazardous nature of asbestos fibers and the fact that moving belts blew the asbestos dust about the room so that it accumulates in the room. Also, in the 1930s, asbestos victims began to sue Johns-Manville and Multibestos because of their asbestos-related illnesses. As a result, Dr. Hamilton wrote to Gerald Swope, President of General Electric, informing him that these suits were justified. She further recommended that General Electric take safety precautions, including an evaluation of the situation and dust counts, to avoid this litigation.

47. Furthermore Carl Obermaier, a GE plant manager, wrote to Hamilton

acknowledging/admitting that he knew that inhalation of asbestos dust caused health problems, mainly asbestosis. Furthermore, Obermaier spoke of reports and pamphlets discussing the connection between asbestos exposure and lung cancer. Several letters, dated years 1928-1934, between Hamilton and GE indicate that GE was well aware of the excessive asbestos dust contained inside their various plants. Thus, GE had knowledge that asbestos dust was harmful, but still refused to warn its employees and its customers to whom it sold its asbestos-containing products.

48. Throughout the relevant time periods, GE conducted various asbestos tests in their different plants, further indicating that they knew that asbestos was hazardous since they tested for levels of asbestos dust. Also, when tested, several times GE ran well above the maximum allowable level. For example, a survey done in 1973 of several GE plant buildings found an asbestos dust concentration count of 1540 fibers greater than five microns per millimeter of air. GE was also aware that large quantities of asbestos fiber would blow into the exhaust system. Many times GE chose to use the cheaper asbestos fiber in the plants, even though the cheaper fiber produced more dust into the exhaust system, however, GE, knowing of the harmful effects of asbestos, still refused to warn those individuals/workers who would come into contact with their products. Instead, they used these cheaper asbestos fibers attempting to profit at the expense of those individuals who would inhale these fibers from their products. As a result of the tests conducted at General Electric's plants, various recommendations were given to GE during the 1950s to 1970s, including the improvement of ventilation (including exhaust systems), periodic chest x-rays, pulmonary function tests, medical surveillance programs, wearing of an approved respirator, gloves, and protective clothing, increasing air flow, better maintenance of dust filters, use of industrial vacuum to clean site, complete enclosure of saw and apparatus, checking filters at regular intervals to insure working properly, and the cutting of cloth where asbestos dust could be minimized. More specifically, in letters dated 1956 and 1959, Dr. Elkins informed the GE Lowell Plant that those employees working around asbestos should receive periodic chest x-rays due to the hazardous nature of asbestos. Also, he informed that the workers who sweep the area should wear respiratory equipment. Therefore, General Electric knew or should have known that asbestos could be harmful to those individuals exposed to this dust.

49. Moreover, various published reports and articles available to GE prove that GE was empowered with the knowledge that asbestos caused several diseases. Some of the reports and articles include:

(1) <u>Safety Management: Accident Cost and Control</u>, a published article written in 1956 by Dr. R. Simonds and Dr. J. Grimaldi, which discusses the fact that asbestos produces asbestosis, the symptoms of asbestos, and how asbestos dust can be found in all stages of asbestos handling;

(2) <u>Asbestos Dust Exposures at Various Levels and Mortality</u>, a published article written in 1967 by Dr. P. Enterline and Dr. A. Kendrick discussing the first reports of asbestosis in the early 1900s, the first reports of mesothelioma were published in 1955, and the acceptance of a causal relationship between asbestos dust and asbestosis and mesothelioma;

(3) <u>Asbestos Exposure Smoking, and Neoplasia</u>, a published article written in 1968 by Dr. I. Selikoff, Dr. E.C. Hammond, and Dr. Jacob Churg, discussing that asbestos workers have a high risk of dying of bronchogenic carcinoma;

(4) <u>Industrial Pneumoconiosis Prevention and Control</u>, a published article written in 1969 by Edmund M. Fenner, director of environmental control at J-M, talks about how scientists became concerned about the connection between the exposure to asbestos fibers and asbestosis in the 1920s. Furthermore the article speaks of the Sarana Laboratory's discovery, through animal and human research in the 1930s, that asbestos exposure did "produce a unique and identifiable pulmonary fibrosis." Additionally, the article also talks about how Britain had become concerned about the link between asbestos dust exposure and lung cancer in the 1950s

(5) <u>Asbestos and Health in 1969</u>, a published article written in 1969 b y George W. Wright, discusses the progression of knowledge about asbestos' relationship with different diseases. Wright begins by talking about the discovery of diseases associated with asbestos exposure in the early 1900s. Then, Wright mentions that in the 1930s, it was pointed out that asbestos poised a problem to the health of workers and that the health problem could be minimized by instituting protective measures to reduce the amount of airborne asbestos dust. Wright also speaks about the various tests conducted to determine the exact relationship between asbestos and diseases. Additionally, Wright indicates that an 80% incidence of asbestosis to workers exposed to asbestos 20 or more years was found, and also that the more asbestos dust concentration in the air the larger % of workers developing cancer. Furthermore, Wright explains that there is a strong relationship between the development of mesothelioma and the exposure to asbestos fibers.

(6) <u>The Health of Chrysotile Asbestos Mine and Mill Workers of Quebec</u>, a published article written in 1972 by Dr. C. McDonald, Dr. M. Becklake, G. Gibbs, Dr. A. McDonald, and C. Rossiter, talks about how asbestos has been known to cause three identifiable diseases, including asbestosis, lung cancer, and mesothelioma. The article also discusses the fact that the percentage of people who develop lung cancer rises with the increase in asbestos dust exposure.

(7) <u>Recommended Safety Practices for Handling Asbestos Fiber</u>, an article written by Johns-Manville indicating that asbestos should be handled in a way as to prevent asbestos dust and that approved asbestos respirators should be worn when handling asbestos fibers.

(8) <u>Encyclopedia of Occupational Health and Safety</u>, written in 1971 by J.C. Gilson, talks about the health hazards, including several diseases, associated with the inhalation of asbestos fibers and asbestos dust. The Encyclopedia also speaks of the first incidence of asbestosis discovered in 1899 in London and the fact that in the 1930s asbestos was seen as a major cause of health hazards in the asbestos textile industry in the U.S. and other countries.

50.   The McCarty Corporation (successor to McCarty Branton, Inc. and predecessor and successor to McCarty Insulation Sales, Inc.), Reilly-Benton Company, Inc., Marquette

Insulations, Inc., and Taylor-Seidenbach, Inc., manufactured asbestos-containing pipe covering, blankets, special fittings, gaskets, blocks, valves, cements, mastics, and jackets. They sold these products throughout the time that Curtis D. Morgan was exposed to asbestos to the various sites at which Curtis D. Morgan worked and were exposed. In addition, The McCarty Corporation, Inc., Reilly-Benton Company, Inc., Marquette Insulations, Inc., and Taylor Seidenbach, Inc. distributed asbestos-containing products manufactured, distributed, and sold by Bayer Cropscience, Inc. (Successor to Rhone Poulenc AG Company, formerly Amchem Products, Inc. formerly Benjamin Foster Company); coatings, sealants, and mastics), Foster-Wheeler LLC—(block and boiler insulation), Riley Power, Inc. (block and boiler insulation), Rapid American Corporation (successor to Philip Carey Manufacturing Co.) (various asbestos-containing products including, but not limited to, cement, block, pipe covering, and adhesives), General Electric Company (electric wire and cable, block and turbine insulation including but not limited to sprayed asbestos insulation), CBS Corporation (formerly Westinghouse Electric Corporation) (block, boiler and turbine insulation as well as Micarta). During various periods of time from the 1950s throughout the 1980s, The McCarty Corporation, Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc. would package the above described products from other distributors and manufactures' products in their own boxes and packaging, and hold out the products as their own, thus making them liable as the manufacturer under Louisiana Law. In addition, The McCarty Corporation, Reilly-Benton Company, Inc., Marquette Insulations, Inc., and Taylor Seidenbach, Inc. also did contracting work at locations at which Curtis D. Morgan was working thereby exposing him during his handling of these products.

51.   The asbestos-containing products manufactured, distributed and/or sold by all "asbestos defendants" were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufactures. Further, defendants failed and refused to warn Curtis D. Morgan of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause diseases such as mesothelioma, cancer, asbestosis, pleural diseases, and other ill health effects.

52.   As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed and/or sold by the "asbestos defendants," Curtis D. Morgan inhaled asbestos fibers and other harmful substances emitted by the normal use of said products, proximately causing the asbestos-related mesothelioma, and other related ill health effects from which he suffers. Plaintiff further contends that said

19

"asbestos defendants" are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warning and instructions. Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

53.    As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed and/or sold by the "asbestos defendants," Curtis D. Morgan carried home asbestos on his clothing, skin, hair, shoes, socks, and other objects, and Curtis D. Morgan inhaled asbestos fibers. These loose fibers were emitted by the normal use of said products, proximately causing the asbestos-related mesothelioma and other ill health effects associated therewith, from which Curtis D. Morgan suffers.  Plaintiff further contends that said "asbestos defendants" are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warning and instructions.  Further, "asbestos defendants" are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

54.    Prior to the time Curtis D. Morgan was exposed to asbestos, all defendants were aware or should have been aware of the health hazards associated with exposure to asbestos, including but not limited to asbestos-related pulmonary disease, pleural plaques, pleural thickening, fibrosis, asbestosis, cancer, and mesothelioma. Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceases; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims. Such conduct constitutes fraud under Louisiana Law.

55.    All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

56.   As a result of misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested desirable, and suitable for use, and as a result of the defendants suppression of the truth about the hazards associated with exposure to said products, Curtis D. Morgan was exposed to products manufactured, distributed, and sold by "asbestos defendants" and, as a result thereof, Curtis D. Morgan was exposed to asbestos and contracted asbestos-related mesothelioma and other related ill health effects, which were first diagnosed on or about October 19, 2015.

57.   The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Curtis D. Morgan and other employees who remain uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job.  As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted the disease. These actions constitute fraud under Louisiana Law and entitle plaintiffs to damages.

58.   The health hazards of asbestos have been recognized by those in the business for two thousand years.  The Greek geographer Strabo and the Roman historian Pliny the Elder both recognized asbestos in slaves whose task was to weave asbestos into cloth.  There is conclusive evidence (more specifically outlined below) that that by the end of 1930, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis and other asbestos-related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Curtis D. Morgan.

59.   By the time Curtis D. Morgan, began working with and around asbestos products, virtually every state in the United States recognized asbestosis and silicosis as compensable claims under workers' compensation laws.  In fact, the Louisiana legislature in 1952, when it enacted its first Workers' Compensation Occupational Disease Act, listed asbestos and silicosis as a compensable occupational disease.  Moreover, all suppliers (as well as independent contractors) to any company with Government contracts were bond to comply with health and safety requirements of the Walsh Healy Public Contract Act first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943.  These mandatory

regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. They also required isolation of dusty work, ventilation, use of respirators, and medical examinations by doctors. Despite this, Curtis D. Morgan was never warned of any hazard associated with asbestos or silica, was never protected by use of adequate ventilation, was required to work next to insulators using asbestos products and with and around silica, and was required to pick up asbestos containing debris and silica. He never saw a warning on any asbestos or silica product nor were they warned by any contractor using asbestos or silica products. Despite the fact that all defendants were aware of the hazards of asbestos and silica and other toxic substances to which Curtis D. Morgan was exposed, they failed and refused to warn of these dangers and, furthermore, concealed these hazards. Moreover, defendants suppressed and prevented the dissemination of information relating to the hazards of asbestos and silica exposure, thus constituting fraud under Louisiana law. Even after OSHA became the law in 1971, Curtis D. Morgan was not warned of the health hazards associated with exposure to asbestos and silica.

60. The acts of the defendants, as described above, constitute a fraudulent misrepresentation and/or concealment which proximately caused the injuries to the Petitioners in the following manner:

> (1) The material published or caused to be published was false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

> (2) The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:

> (a) To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;

> (b) To assist in the continued pecuniary gain of the defendants through the sale of asbestos products to an ignorant public;

> (c) To influence in the defendant's favor, legislation to regulate asbestos exposures and unlimited medical and disability claims for compensation;

> (d) To provide a defense against lawsuits brought for injury resulting from asbestos disease;

> (e) To prevent relevant medical inquiry about asbestos disease;

> (f) To mislead the general public, and the Petitioner herein, about the hazards

associated with asbestos products; and

(g)  To induce the Petitioner to use and continue to use asbestos products.

(3)  The petitioner reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products because Petitioner believed it to be safe.

(4)  Defendants intended the Petitioner to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and therefore to continue their exposure to those products.

(5)  Defendants are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Petitioner and others deciding to use the said asbestos-containing products to which Petitioner was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

61.  Insurance premiums were set based on the risks posed by the insured. Insurance companies discussed the hazards of asbestos with insured who manufactures, used, or distributed asbestos products. Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly. This was true prior to the time Curtis D. Morgan was first exposed to asbestos and continued throughout his employment. The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting. When the Supreme Court of North Carolina (*McNeely v. Carolina Asbestos Co., May 23, 1934*) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the McNeely case and others like it injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates."; he wrote that even though rates for those in the asbestos business were high, "their adequacy ...is generally doubted." To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance--"sort of a right pocket to left

23

pocket...in other words there wasn't any way (insurance companies) could lose money on it" (See deposition of Harry J. Flynn in Bradley v. Todd Shipyards, Inc., C.A. No. 85 – 056757, Div. "D", Civil District Court for the Parish of Orleans.)

62.    That all defendants and the companies that insured them knew of the health hazards associated with exposure to asbestos since 1930's (and suppressed this information) is shown by numerous documents and testimony. In fact, the knowledge was so well recognized in the asbestos industry that the insurance industry considered confessing liability; instead, they decided to make it "economically impossible" for plaintiffs to pursue their claims. The minutes of meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry association) confirm that the hazards of asbestos exposure have been known for many years. These minutes specifically state that medical research in 1990 linked asbestos with asbestosis and by 1935 it was recognized that asbestos caused cancer. In a memorandum of a meeting of a discussion group dated April 21, 1977, it was stated: The meeting closed with a unanimous rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed between themselves as to their respective losses and expenses. That insurance companies and their insured's were working together to discourage plaintiffs from pursuing valid claims is also demonstrated in earlier memos. In minuets dated May 22, 1974, discussing *Borel v. Fibreboard Paper Products Corporation,* 493 F.2d 1076, (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974), it stated: "The appeals court decision in the Borel case of course sets a very bad precedence for our other pending asbestosis cases and (sic) this jurisdiction we will soon have to formulate a 'game plan' for the continued defense of these asbestosis cases **with the other defendants."** In a memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance companies would resist pending cases "and attempt to make this economically (sic) impossible for the plaintiffs to pursue the other cases." These attempts to prevent and stifle valid claims by plaintiffs such as the heirs of Curtis D. Morgan, Curtis D. Morgan, herein show that the defendants, to this day, are committing fraud.

63.    Documents and testimony of defendants herein as well as associated asbestos companies is replete with the fact of knowledge and fraud. Although Johns-Manville (hereinafter sometimes referred to as "J-M" and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M") are not defendants herein, a discussion of their knowledge is necessary to show knowledge within asbestos industry associations, within the insurance industry, and among other defendants. In 1929, Johns-Manville Corporation and Raybestos-

Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial investigation began in October of 1929 and was completed in January of 1931. The study included the following: a survey of the dust conditions in the asbestos mines, mills and fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell, Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan. Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W.R. Seigle (Vice President of J-M), Vandiver Brown (General Counsel for J-M), S.A. Williams (President of Johns-Manville Products Corporation), and Summer Simpson (President of Raybestos-Manhattan, Inc.). The minutes of these meetings which occurred in November, 1933, through January, 1934, reflect that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M facilities, as well as expanding the scope of the study to include additional J-M facilities and  facilities of other members of the asbestos industry. Dr. Lanza felt that the Metropolitan Life Insurance Company should advise the companies of the types of respirators which should be provided to the employees engaged in making a study of this problem. On December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof" of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled "Effects of Inhalation of Asbestos Dust on the Lungs of Asbestos workers." This "draft" was also circulated to representatives of Raybestos-Manhattan, who prepared editorial comments and recommendations for Dr. Lanza concerning the final publication of the report. Johns-Manville prepared similar comments. The Metropolitan report informed Raybestos-Manhattan and Johns-Manville of the following: that prolonged exposure to asbestos dust caused pulmonary fibrosis; that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could be substantially reduced. After incorporating some of J-M's and R-M's editorial suggestions, Dr. Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers" in the Public Health Reports, Volume 50, No. 1, January 4, 1935.

64.    In November 1936 Vandiver Brown of Johns-Manville, together with Summer Simpson, President of Raybestos-Manhattan, solicited other members of the Asbestos Products

Industry to participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute. Dr. Leroy Gardner was the director of the Trudeau Foundation at the time. A report of these works was prepared by Dr. Gardner on April 18, 1938. The report was sent to Vandiver Brown, who in turn sent it to Dr. Lanza for his comments.

65.    In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and Rubber Company's Paterson, New Jersey plant, he had observed a significant number with lung changes which he believed were due to asbestos exposure. Dr. Roemer advised that the men be informed of his findings and that the be instructed to secure outdoor employment which did not involve any exposure to asbestos dust. Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease. Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of x-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be concerned. Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company. As testifies to by Mr. Roemer, "I'll never forget, I turned to Mr. Brown...and said, 'Mr. Brown, do you mean to tell me you would let them work until they dropped dead?' He said, "Yes. We save a lot of money that way." (Deposition Charles H. Roemer taken April 25, 1984, Johns-Manville Corp. et al. v. the United States of American. U.S. Claims Court Civ. No 465-83C).

66.    As a result of the aforesaid Metropolitan Life study, additional health research on the effects of prolonged and excessive inhalation of asbestos fiber on human beings was undertaken at the Saranac Laboratory. A report on this research was delivered at the Seventh Saranac Lake Symposium in 1952 and was entitled "Pulmonary Function Studies in Men Exposed for Ten or More Years to inhalation of Asbestos Fibers" by Fernand Gregorie and George W. Wright.

67.    In addition to the IHF, there were other trade associations which were formed to aid and service companies in the asbestos industry. Members of the Asbestos Textile Institute (ATI), founded on November 16, 1944, included companies which produced asbestos containing cloth and other products. At the June 13, 1946, meeting of the Asbestos Textile Institute, a question was posed as to whether or not a committee should be informed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control

committee of the Asbestos Textile Institute recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people.  In 1946, the ATI was presented with a plan for a central medical committee which would call for individual medical programs at the facilities using asbestos as well as a central department which would be responsible to the association.  Recommendations for initial examinations and periodic follow-up examinations were also made.  The recommendation for periodic   medical examinations was characterized by the presenting doctor as "fundamental I an industry where there was a "known occupational health hazard"".  While the ATI considered this proposal, it nonetheless elected to defer the plan.  During the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide ranging research on various issues dealing with asbestos-related disease in the asbestos industry.  However, in some instances, the research projects and proposals were discarded.

68.    Another trade organization was the National Insulation Manufactures Association ("NIMA"), which formed in December of 1958 as a joint venture trade association to serve as a voice for the mineral insulation industry.  After 1958, personnel of Ruberoid/GAF (defendant herein) attended most, if not all, NIMA meetings at which health hazards were frequently the topic of formal discussions.  NIMA members had unequivocal knowledge of the potential health hazards posed by unprotected and prolonged exposure to excessive quantities of airborne asbestos fiber.  The testimony of Harry Kaufman, who came to Ruberoid in 1958 as Assistant Director of Quality Control, admit knowledge of the potential health hazards to an unprotected worker from exposure to asbestos fiber as far back as 1943 when he attended a five month course at the University of Maryland on Industrial Safety.  Charles Limerick, former manager of the Ruberoid Vermont Mines, has admitted that he was aware of dangers of asbestos as far back as the 1930's and 1940's.  GAF/Ruberoid was out on notice of dangers in 1935 or 1936 through correspondence with "Asbestos" magazine.  Ruberoid subscribed and advertised in "Asbestos".  Moreover, Ruberoid was prodded by lawsuits brought by its employees alleging that they had developed asbestosis as early as 1934.

69.    Summer Simpson, the first Raybestos-Manhattan Incorporated President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels.  These documents clearly

evidence knowledge, beginning in at least the 1930's, dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of time could and would produce asbestos-related diseases. Numerous letters in the "Sumner Simpson" document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan Incorporated was going to have to deal with that reality.

70. Defendant, Taylor-Seidenbach, Inc., did contracting work as early as the 1940s. Likewise, The McCarty Corporation (formerly McCarty Branton, Inc.), Marquette Insulations, Inc., and Reilly-Benton, Inc., have done contracting work since their initial existence. Accordingly, Eagle, Inc., The McCarty Corporation (formerly McCarty Branton, Inc.), Reilly-Benton, Inc., Marquette Insulations, Inc., and Taylor-Seidenbach were aware of the health and safety requirements of the Walsh Healy Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed *infra*). These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Moreover, these defendants, being asbestos insulation contractors, had to pay higher insurance premiums as a consequence thereof. Curtis D. Morgan, was exposed to asbestos both through these defendants contracting work and through products manufactured, distributed, and sold by them. Yet at no time was Curtis D. Morgan protected from these hazards nor warned of these hazards. Even after OSHA became the law in 1971, Curtis D. Morgan was not advised of the hazards associated with exposure to asbestos. These defendants were aware of the hazards of asbestos but failed and refused to warn them of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law. See deposition of Fred J. Schuber, Jr., 05/31/90, pages 149-155, 176-179 and exhibits attached to the deposition of Schuber taken 05/09/90; and deposition of Thomas R. Dimm, 02/03/86, pages 65-66; and Eagle, Inc.'s response #4 to plaintiffs' interrogatories in the case of Atzenhoffer, et al v. National Gypsum, Co., et al, C. A. #89-894, which responses are dated March 27, 1990; and Act No. 532 (1952) amendments to the Louisiana Workers' Compensation Act.

71. Since the early 1940s, defendant, Foster-Wheeler LLC (formerly Foster-Wheeler Corporation), was a major manufacturer of boilers used in the construction of both commercial

and U.S. Navy vessels. Since that time when Curtis D. Morgan was last exposed, they supplied boilers to virtually every shipyard constructing and repairing vessels in the country. Accordingly, since the early 1940s', they were aware of the health and safety requirements of the Walsh Healy Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. .Maritime Commission in 1943 (discussed _infra_). These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Despite this knowledge, at no time was Curtis D. Morgan advised of these hazards as defendants failed and refused to warn them of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law. In addition to manufacturing and selling boilers, (and providing the asbestos insulation products for insulation of their boilers and the piping connecting their boilers), they constructed their boilers on-site and provided an on-site representative during the construction of their boilers, thus exposing Curtis D. Morgan to asbestos during their operations.

72.   Rapid American Corporation (successor to Phillip Carey Manufacturing Co.) (hereinafter sometimes "Carey"), in an advertisement appearing in the magazine "Asbestos", in March of 1930, boasted that it had been supplying asbestos and asbestos products for over fifty (50) years. Carey got into the insulation contracting business as well. Publicity over asbestosis among Carey's Quebec mine employees led to an asbestos strike. Moreover, Carey was named as a defendant in claims brought by Swartout, Riley, Streithorst, Gilivich, and Onofrio, with notice to Carey dated from 1955-1963 and Latto in 1961-1962. Additionally, Dr. Thomas Mancuso reported directly to the top management of Carey about the urgent need for measures to protect employees as well as customers of Carey's products and neighbors of Carey facilities exposed to asbestos air pollution.

73.   Of particular note is the expose' written by Burton LeDoux on the hazards of asbestos. The newspaper report by Mr. LeDoux which appeared in the newspaper Le Devoir on January 12, 1949, recounted his investigation of the asbestos mines owned by Quebec Asbestos Corporation, Ltd., a subsidiary of Phillip Carey. LeDoux's account described case histories of workers disabled by asbestosis, local doctors who were afraid to tell them so, estimates of how much profit Carey mined out of the town, descriptions of asbestos air pollution in town, commentary on the "ample and authoritative medical literature... that the disease is incurable and fatal"; and culminates with what the author called "proof of company and government responsibility" starting in 1944.

74.   All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

75.   As a result of the aforementioned acts of negligence, intentional tort, fraud, and strict liability of all of the hereinabove named defendants, Curtis D. Morgan contracted asbestos-related mesothelioma and other related ill health effects, for which all defendants are jointly, severally, and in solido liable.

**NEGLIGENCE ALLEGATIONS AGAINST ANCO INSULATIONS, INC., AEROJET - GENERAL CORPORATION, BARNARD AND BURK, INC., BECHTEL CORPORATION, BECHTEL POWER CORPORATION, CBS CORPORATION (f/k/a Westinghouse Electric Corporation), EAGLE, INC., FOSTER WHEELER, LLC, GENERAL ELECTRIC COMPANY, HOPEMAN BROTHERS, INC., JACOBS CONSTRUCTORS, INC., THE MCCARTY CORPORATION, REILLY-BENTON COMPANY, INC., RILEY POWER, INC., TAYLOR-SEIDENBACH, INC., THE TRAVELERS INDEMNITY COMPANY (AS INSURER OF THE MCCARTY CORPORATION), TURNER INDUSTRIES GROUP, LLC, AND UNION CARBIDE CORPORATION**

76.   The illnesses, disabilities, and damages of Curtis D. Morgan are a direct and proximate result of the negligence of each Defendant and/or its predecessor-in-interest in that said entities installed, removed, produced, sold and otherwise put into the stream of commerce asbestos, asbestos-containing products, and machinery and equipment requiring or calling for the use of asbestos and asbestos-containing products, which the Defendants knew, or in the exercise of ordinary care, should have known were deleterious and highly harmful to Curtis D. Morgan's health and well-being.   The Defendants were negligent in one, some or all of the following respects, among others, same being the proximate cause of Curtis D. Morgan's illnesses, disabilities, and damages:

(a)   in failing to timely and adequately warn Curtis D. Morgan of the dangerous characteristics and serious health hazards associated with exposure to asbestos, asbestos-containing products, and machinery and equipment requiring or calling for the use of asbestos and asbestos-containing products;

(b)   in failing to provide Curtis D. Morgan with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect Curtis D. Morgan from being harmed and disabled by exposure to asbestos,

asbestos-containing products, and machinery and equipment requiring or calling for the use of asbestos and asbestos-containing products;

(c) in failing to place timely and adequate warnings on the asbestos-containing products themselves, on the containers of said asbestos, the containers of asbestos-containing products, and the machinery and equipment requiring or calling for the use of asbestos and asbestos-containing products to warn of the dangers to health by coming into contact with said asbestos, asbestos-containing products, machinery and equipment;

(d) in failing to take reasonable precautions or exercise reasonable care to publish, adopt and enforce a safety plan and safe method of handling and installing asbestos and asbestos-containing products, or utilizing the machinery and equipment requiring or calling for the use of asbestos and asbestos-containing products in a safe manner;

(e) in failing to develop and utilize a substitute material to eliminate asbestos fibers in the asbestos-containing products, and the machinery and equipment requiring or calling for the use of asbestos and asbestos-containing products;

(f) in failing to properly design and manufacture asbestos and/or asbestos-containing products, and machinery and equipment requiring or calling for the use of asbestos and asbestos-containing products, for safe use under conditions of use that were reasonably anticipated;

(g) in failing to properly test said asbestos-containing products and machinery and equipment before they were released for consumer use; and

(h) in failing to recall and remove from the stream of commerce said asbestos-containing products and machinery and equipment requiring or calling for the use of asbestos and asbestos-containing products despite knowledge of the unsafe and dangerous nature of such products, machinery or equipment.

**STRICT LIABILITY ALLEGATIONS AGAINST ANCO INSULATIONS, INC., AEROJET - GENERAL CORPORATION, BARNARD AND BURK, INC., BECHTEL CORPORATION, BECHTEL POWER CORPORATION CBS CORPORATION (f/k/a Westinghouse Electric Corporation), EAGLE, INC., FOSTER WHEELER, LLC, GENERAL ELECTRIC COMPANY, HOPEMAN BROTHERS, INC., JACOBS CONSTRUCTORS, INC., THE MCCARTY CORPORATION, REILLY-BENTON COMPANY, INC., RILEY POWER, INC., TAYLOR-SEIDENBACH, INC., THE TRAVELERS INDEMNITY COMPANY (AS INSURER OF THE MCCARTY CORPORATION), TURNER INDUSTRIES GROUP, LLC,**

## AND UNION CARBIDE CORPORATION

77.   All of the allegations contained in the previous paragraphs are realleged herein.

78.   Curtis D. Morgan was exposed to and used asbestos-containing products that were manufactured and distributed by the Defendants and their predecessors-in-interest for use as construction materials in various commercial, residential or industrial operations.  Furthermore, Curtis D. Morgan was exposed to and used machinery and equipment utilizing or specifying the use of asbestos or asbestos-containing products in commercial, residential or industrial operations.  Installation of these asbestos-containing products, machinery and equipment was necessarily a part of the intended chain of use or purpose; thus the products were not reasonably fit for the purposes for which they were intended.  Plaintiffs would show that the defective condition of the products rendered such products unreasonably dangerous, and that the asbestos-containing products, machinery and equipment were in this defective condition at the time they left the hands of Defendants.  Further, said products were unreasonably dangerous per so, unreasonably dangerous due to Defendants' failure to warn, and unreasonably dangerous due to a design defect.

79.   The Defendants were engaged in the business of selling asbestos-containing products, and machinery and equipment requiring or calling for asbestos or asbestos-containing products, and these asbestos-containing products, machinery and equipment, without substantial change in the condition in which they were sold, were a producing cause of the illnesses, disabilities, and damages of Curtis D. Morgan.

80.   Defendants knew that these asbestos-containing products, and machinery and equipment utilizing asbestos-containing products, would be used without inspection for defects and, by placing them on the market, represented that they would safely do the job for which they were intended, which must necessarily include safe manipulation and installation of the asbestos-containing products and operation, maintenance and repair of the machinery and equipment requiring or calling for the use of asbestos and asbestos-containing products.

81.   Curtis D. Morgan was unaware of the hazards and defects in the asbestos-containing products of the Defendants which made them unsafe for purposes of manipulation and installation.  Similarly, Curtis D. Morgan was unaware of the hazards and defects in the machinery and equipment requiring or calling for the use of asbestos and asbestos-containing materials.

82.   During the period that Curtis D. Morgan was exposed to and used the

32

asbestos-containing products, machinery and equipment of the Defendants, these asbestos-containing products, and machinery and equipment utilizing asbestos-containing products, were being used in a manner which was intended and/or reasonably foreseeable by Defendants.

**STRICT LIABILITY AND NEGLIGENCE AGAINST ANCO INSULATIONS, INC., AEROJET - GENERAL CORPORATION, BARNARD AND BURK, INC., BECHTEL CORPORATION, BECHTEL POWER CORPORATION, CBS CORPORATION (f/k/a Westinghouse Electric Corporation), EAGLE, INC., FOSTER WHEELER, LLC, GENERAL ELECTRIC COMPANY, HOPEMAN BROTHERS, INC., JACOBS CONSTRUCTORS, INC., THE MCCARTY CORPORATION, REILLY-BENTON COMPANY, INC., RILEY POWER, INC., TAYLOR-SEIDENBACH, INC., THE TRAVELERS INDEMNITY COMPANY (AS INSURER OF THE MCCARTY CORPORATION), TURNER INDUSTRIES GROUP, LLC, AND UNION CARBIDE CORPORATION– (hereinafter "CONTRACTOR DEFENDANTS")**

83.   The Defendants contracted with the owners of the jobsites identified on Exhibit "A" to perform certain activities at those jobsites prior to and/or during Curtis D. Morgan's exposure period at each such jobsite.

84.   At times, the Defendants subcontracted with others to perform a portion of the activities that they contracted with the owners of the jobsites identified on Exhibit "A" to perform.

85.   The activities conducted by the Defendants and/or their subcontractors, included, but were not limited to, the application, demolition, displacement, disturbance, fabrication, installation, purchase, removal, repair, replacement, tearing out, and use of asbestos-containing products at, on and/or for the jobsites identified in Exhibit "A". The foregoing activities resulted in the release of substantial quantities of asbestos dust into the work environment.

86.   Curtis D. Morgan was exposed to and inhaled substantial quantities of asbestos dust as a direct and proximate result of the activities of the Contractor Defendants and their subcontractors.

87.   The Contractor Defendants negligently performed and/or permitted their subcontractors to negligently perform the foregoing activities in the following non-exclusive particulars:

(a) By creating a work environment laden with asbestos dust and an unhealthy and unsafe place for Curtis D. Morgan to work;

(b) By failing to provide warnings, or adequate warnings, to Curtis D. Morgan of the dangers and risks posed by the asbestos in the atmosphere in which Curtis D. Morgan worked; of the need for correct, adequate, and/or appropriate

safety equipment; of critical medical and safety information regarding asbestos hazards in general and of hazards at the jobsite in particular; and of the hazards created by Defendants' activities;

(c) By failing to test, or adequately test, the work environment for the presence of toxic, hazardous and carcinogenic chemicals, particularly asbestos;

(d) By failing to apprize Curtis D. Morgan of the need for periodic medical examinations as a result of Curtis D. Morgan's exposure to asbestos created by Defendants' activities;

(e) By failing to ventilate and/or properly ventilate the areas in which Curtis D. Morgan performed activities, or otherwise provide a safe and suitable means of eliminating the amount of asbestos dust in the air;

(f) By failing to clean up and/or properly clean up the asbestos dust created by Curtis D. Morgan's activities;

(g) By failing to formulate policies and adopt plans, procedures, and supervision necessary for the adequate protection of persons, such as Curtis D. Morgan, who came into contact with asbestos dust as a result of Curtis D. Morgan's activities;

(h) By recklessly concealing from Curtis D. Morgan and negligently failing to provide critical medical and safety information to Curtis D. Morgan regarding the safety and health risks associated with the asbestos and asbestos-containing products;

(i) By failing to adopt and/or failing to enforce safety rules after such rules were actually adopted;

(j) By failing to keep abreast of the scientific and engineering knowledge regarding the dangers of, and protection against, occupational exposure to asbestos;

(k) By failing to properly supervise and/or monitor their work areas for compliance with safety regulations;

(l) By failing to supervise their operations and the operations of their subcontractors;

(m) By commencing and continuing operations, which were under their control and supervision when they knew or should have known that such operations

34

would cause Curtis D. Morgan and co-employees to be exposed to asbestos, without protection, on a daily basis;

(n) By failing to timely, adequately and safely remove asbestos hazards from the workplace;

(o) By failing to comply with applicable State and Federal regulations regulating workplace exposure to asbestos (including, but not limited to, those regulations promulgated by the U. S. Department of Labor pursuant to the Walsh-Healey Public Contracts Act and the Occupational Safety and Health Act);

(p) By applying, demolishing, displacing, disturbing, fabricating, installing, removing, repairing, replacing, and tearing out products that Defendants knew, or in the exercise of reasonable diligence should have known, were unreasonably dangerous, or unreasonably dangerous per se;

(q) By not providing safety instructions or sufficient safety instructions for eliminating or reducing the health risks associated with their activities;

(r) By failing to test or adequately test the materials with which they were working to determine the presence of asbestos;

(s) By failing to purchase products and materials that did not contain asbestos;

(t) By purchasing, using, applying, demolishing, displacing, disturbing, fabricating, installing, removing, repairing, replacing, and tearing out products that contained asbestos;

(u) By failing to properly label products that they purchased, used, applied, demolished, displaced, disturbed, fabricated, installed, removed, repaired, replaced, and tore out as containing asbestos; and

(v) By conducting their activities through such other negligent acts or omissions, as may be revealed in discovery and/or proven at trial.

88.    The negligent acts outlined above were a substantial contributing factor in Curtis D. Morgan's exposure to dangerous and hazardous levels of asbestos, and resultant damages.

89.    The foregoing negligent acts of the Contractor Defendants were a cause-in-fact and proximate cause of the Curtis D. Morgan' injuries and damages.

90.    Additionally, the Contractor Defendants are liable for the acts of their subcontractors under the doctrine of *respondeat superior* and Louisiana Civil Code article 2320.

91.    Additionally and alternatively, the asbestos-containing products that were purchased, used, applied, demolished, displaced, disturbed, fabricated, installed, removed, repaired, replaced, and torn out by the Contractor Defendants were in the care, custody and control of the Contractor Defendants, were unreasonably dangerous due to the presence of asbestos, and were a proximate cause and cause-in-fact of the Curtis D. Morgan>s injuries. Therefore, the Contractor Defendants are strictly liable for Curtis D. Morgan's damages pursuant to Louisiana Civil Code article 2317.

92.    Additionally, when such contractors did not employ Curtis D. Morgan, Curtis D. Morgan was exposed to the asbestos containing products that were purchased, used, applied, demolished, displaced, disturbed, fabricated, installed, removed, repaired, replaced, and torn out by the Contractor Defendants that were in the care, custody and control of the Contractor Defendants and were unreasonably dangerous due to the presence of asbestos.

## EMPLOYER ALLEGATIONS AGAINST
### AEROJET - GENERAL CORPORATION, BARNARD AND BURK, INC., BECHTEL CORPORATION, BECHTEL POWER CORPORATION, HOPEMAN BROTHERS, INC., RILEY POWER, INC., TURNER INDUSTRIES GROUP, LLC, EQUITABLE EQUIPMENT CO., INC., (via the liability insurers for it and its executive officers Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, Courtney Pennington, EMPLOYERS INSURANCE COMPANY OF WAUSAU (f/k/a Employer's Mutual Liability Insurance Company of Wisconsin), TRAVELERS CASUALTY & SURETY COMPANY, THE TRAVELERS INDEMNITY COMPANY, and CONTINENTAL INSURANCE COMPANY (f/k/a Fidelity Fire & Casualty Company) (hereinafter "the Employer Defendants")

94.    Plaintiff alleges negligent, grossly negligent, and wanton misconduct on behalf of the Employer Defendants in failing to provide and/or ensure a safe workplace for their employees, free of hazardous concentrations of asbestos and asbestos-containing dust.

95.    Curtis D. Morgan was employed by the Employer Defendants as shown in Exhibit "A" and during such time was continuously exposed to asbestos and asbestos-containing dust without the provision of appropriate safeguards by the Employer Defendants.

96.    The Employer Defendants and/or their predecessors-in-interest, subsidiaries, or successors-in-interest undertook and assumed the duties and responsibilities owed individually and/or delegated to them for providing Curtis D. Morgan with a safe place to work and the Employer Defendants wantonly and/or negligently and/or willfully failed to provide Curtis D. Morgan a safe place to work.

97.    The Employer Defendants delegated to its executive officers and directors, the responsibility to provide Curtis D. Morgan with proper supervision, safety instruction, warnings

concerning dangers or hazards in the workplace, and generally to provide Curtis D. Morgan a safe workplace and to protect Curtis D. Morgan's life, health, safety and welfare while employed by the Employer Defendants. Plaintiffs allege that the executive officers and directors had the following responsibilities delegated to them by the Employer Defendants or actually undertook to perform the following duties:

(a)     inspection, approval and supervision of the work of Curtis D. Morgan and his co-employees;

(b)     to see that proper safety rules were adopted, promulgated, and enforced concerning the use of respiratory protection devices;

(c)     to see that Curtis D. Morgan and his co-employees performed the duties pertaining to their work in a proper, safe and workmanlike manner;

(d)     to see that Curtis D. Morgan and his co-employees used safe and sound principles and practices in their work;

(e)     to make health and hygiene decisions on any and all questions regarding the use of respiratory protection devices;

(f)     to keep abreast of state of the art knowledge as it pertains to the dangers of asbestos inhalation;

(g)     to provide adequate warnings, physical examinations, safety equipment, ventilation, and breathing apparatus, where such was necessary in order to prevent Curtis D. Morgan from being harmed by exposure to asbestos in the environment which Curtis D. Morgan was required to work;

(h)     to make certain that employees, including Curtis D. Morgan, were provided a safe working environment free from asbestos dust inhalation;

(i)     to comply with applicable State and Federal regulations regulating workplace exposure to asbestos, including but not limited to those regulations promulgated by the U.S. Department of Labor pursuant to the Walsh/Healey Act and the Occupational Safety and Health Act; and

(j)     to provide Curtis D. Morgan with a safe place to work.

98.     The Employer Defendants breached their duty of ordinary care to the Curtis D. Morgan by negligently performing duties owed individually and/or delegated to them, directly and proximately causing the asbestos-related injuries, illnesses, and disabilities of Curtis D. Morgan. The Employer Defendants and/or their predecessors-in-interest, subsidiaries, or

successors-in-interest were negligent in one, some and/or all of the following respects, among others, same being the proximate cause of Curtis D. Morgan's asbestos-related injuries, illnesses, and disabilities:

(a)     in failing to provide adequate safety equipment;

(b)     in failing to protect Curtis D. Morgan from any asbestos exposure;

(c)     in failing to provide Curtis D. Morgan sufficient personal protective equipment, safety devices and work procedures intended to prevent or substantially eliminate the effects of asbestos exposure;

(d)     in failing to supervise or insure compliance with safety guidelines concerning exposure to asbestos or asbestos-containing products;

(e)     in failing to use or misusing equipment and instrumentalities within their control which were intended to minimize Curtis D. Morgan's exposure to asbestos dust;

(f)     in failing to properly perform safety inspections of the Curtis D. Morgan's work place;

(g)     in failing to properly perform engineering services, consulting and direction of work involving the installation, removal, maintenance and/or disturbance of asbestos at Curtis D. Morgan's work sites;

(h)     in failing to comply with applicable State and Federal regulations regarding workplace exposure to asbestos; and

(i)     in failing to properly perform or direct the removal and abatement of asbestos in place at Curtis D. Morgan's work sites; and

(j)     in negligently failing to disclose, warn or reveal medical and safety information to Curtis D. Morgan regarding the hazards of asbestos.

99.     The negligence of the Employer Defendants and their executive officers and directors was a substantial factor and contributed in causing Curtis D. Morgan's asbestos-related injuries, and damages.

100.     The Employer Defendants and its officers and directors, are liable for their intentional, willful and wanton failure to disclose to Curtis D. Morgan the dangers associated with exposure to asbestos, the risks associated with working in an atmosphere contaminated with asbestos and the likely medical effects of such exposure.

101.     Because of Curtis D. Morgan's good faith reliance on the Employer Defendants' misrepresentations, Curtis D. Morgan continued to work in areas contaminated with asbestos and

continued to be exposed to asbestos. As a result, Curtis D. Morgan contracted asbestos-related mesothelioma.

102. The Employer Defendants committed the following intentional acts which caused Curtis D. Morgan to suffer and die from asbestos-related diseases:

(k)   Intentionally failing to provide necessary protection to Curtis D. Morgan;

(l)   Intentionally failing to provide safety equipment as required by safety statutes;

(m)   Intentionally failing to provide clean, respirable air, and proper ventilation;

(n)   Intentionally failing to provide proper medical monitoring;

(o)   Intentionally failing to monitor the extent and output of asbestos dust into the workplace;

(p)   Intentionally failing to warn Curtis D. Morgan and other workers of the dangers associated with asbestos and/or asbestos containing products;

(q)   Intentionally inducing the Curtis D. Morgan and other workers to work in a workplace polluted with asbestos and/or asbestos containing products; and

(r)   Intentionally failing to keep asbestos and/or asbestos containing dust output into the workplace at safe levels.

103. As a result of these acts, the Employer Defendants knew that it was substantially certain that the Curtis D. Morgan would suffer asbestos related diseases including but not limited to asbestosis, asbestos related pleural disease, and mesothelioma.

**PREMISE AND STRICT LIABILITY ALLEGATIONS AGAINST MONSANTO COMPANY, CF INDUSTRIES NITROGEN, LLC, WYETH HOLDINGS, LLC (f/k/a American Cyanamid Company), SHELL OIL COMPANY, SHELL CHEMICAL LP, MURPHY OIL USA, INC., TENNESSEE GAS PIPELINE COMPANY, LLC (f/k/a Tenneco, Inc.), EL PASO ENERGY EST, EPEC OIL COMPANY, AMOS G. POLLARD, CHARLES LAMBERT, RAWLIN DELAUGHTER, RAY BROOKS, THE TRAVELERS INSURANCE COMPANY( individually and as insurer for EPEC Oil, f/k/a Tenneco Oil Company, and its executive officers) ENTERGY CORPORATION , ENTERGY NEW ORLEANS, INC., ENTERGY LOUISIANA, LLC, RILEY POWER, INC., THE DOW CHEMICAL COMPANY, SYNGENTA CROP PROTECTION, LLC (individually and as successor-in-interest to Novartis Crop Protection, Inc., successor-in-interest to Ciba Geigy Corporation), GEORGIA-PACIFIC CONSUMER OPERATIONS, LLC, PHARMACIA CORPORATION, TRANSAMERICAN NATURAL GAS CORPORATION (f/k/a GHR Energy Corp., f/k/a Good Hope Refineries, Inc.), EXXON MOBIL CORPORATION, BASF CORPORATION, CHEVRON ORONITE COMPANY, LLC, HONEYWELL INTERNATIONAL, INC. (successor-in-interest to Allied-Signal, Inc., successor by merger to Allied Corporation, f/k/a Allied Chemical Corporation, and Allied Chemical & Dye Corporation), TEXACO GROUP, LLC, HUNTSMAN PETROCHEMICAL CORPORATION, CHEVRON U.S.A., INC., TEXACO, INC., OCCIDENTAL CHEMICAL CORPORATION, AIR PRODUCTS AND CHEMICALS, INC., EQUITABLE EQUIPMENT CO., INC., (via the liability insurers for it and its executive officers Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, Courtney Pennington, EMPLOYERS INSURANCE COMPANY OF WAUSAU (f/k/a Employer's Mutual Liability Insurance Company of Wisconsin), TRAVELERS CASUALTY & SURETY**

<u>COMPANY, THE TRAVELERS INDEMNITY COMPANY, and CONTINENTAL
INSURANCE COMPANY(f/k/a Fidelity Fire & Casualty Company)
(hereinafter "the Premise Defendants")</u>

104.    Curtis D. Morgan was exposed to asbestos and asbestos-containing materials while working at premises of "The Premise Defendants", and as identified in Exhibit "A". The Premise Defendants at all times relevant to this complaint, have been either the operator and/or the manager and/or the owner and occupier of its respective facilities and in custody of the facilities during the relevant time period. The facilities were defective in that the asbestos and asbestos-containing materials in the facilities created an unreasonable risk of harm to Curtis D. Morgan and other persons on the premises. Curtis D. Morgan was exposed to asbestos and asbestos-containing materials while He was an invitee at the premise defendants' facilities. The defective condition of the facilities was a proximate cause of Curtis D. Morgan's asbestos-related injuries, and damages.

105.    The Premise Defendants are liable to Curtis D. Morgan for their failure to exercise reasonable care to protect Curtis D. Morgan from the foreseeable dangers associated with exposure to asbestos. The Premise Defendants, as the premises operator and/or manager and/or owner and occupier, and/or custodian, had a non-delegable duty to keep the premises safe for invitees. The Premise Defendants knew or should have known of the unreasonable risk of harm inherent in exposure to asbestos and asbestos-containing materials but failed to protect Curtis D. Morgan from said risk of harm. The Premise Defendants failure to protect Curtis D. Morgan from known and/or foreseeable dangers constitutes negligence. Said negligence was a proximate cause of Curtis D. Morgan's asbestos-related injuries and damages.

## ADDITIONAL INSURANCE ALLEGATIONS

106.    Plaintiff avers that OneBeacon America Insurance Company/Commercial Union Insurance Company issued policies of comprehensive general liability insurance to The McCarty Corporation and its executive officer, Marvin R. McCarty, deceased, that provided coverage for the causes of action asserted by plaintiffs against The McCarty Corporation. As such, OneBeacon America Insurance Company/Commercial Union Insurance Company is liable for the damages alleged in the Original Petition and any supplement against The McCarty Corporation and its executive officer, Marvin R. McCarty, deceased, individually, jointly and *in solido.*

107.    Plaintiff avers that The Travelers Insurance Company issued policies of

comprehensive general liability insurance to The McCarty Corporation and its executive officer, Marvin R. McCarty, deceased, that provided coverage for the causes of action asserted by plaintiffs against The McCarty Corporation. As such, The Travelers Insurance Company is liable for the damages alleged in the Original Petition and any supplement against The McCarty Corporation and its executive officer, Marvin R. McCarty, deceased, individually, jointly and *in solido*.

108. Plaintiff avers that Liberty Mutual Insurance Company issued policies of comprehensive general liability insurance to Hopeman Brothers and/or its executive officers that provided coverage for the causes of action asserted by plaintiff against Hopeman Brothers, and/or its executive officers. As such, Liberty Mutual Insurance Company is liable for the damages alleged in the Original Petition and any supplement against Hopeman Brothers and/or its executive officers, individually, jointly and *in solido*.

109. Plaintiff avers that Liberty Mutual Insurance Company issued policies of comprehensive general liability insurance to Wayne Manufacturing and/or its executive officers that provided coverage for the causes of action asserted by plaintiff against Wayne Manufacturing, and/or its executive officers. As such, Liberty Mutual Insurance Company is liable for the damages alleged in the Original Petition and any supplement against Wayne Manufacturing and/or its executive officers, individually, jointly and *in solido*.

110. Plaintiffs aver that The Travelers Insurance Company and/or Travelers Indemnity Company issued policies of comprehensive general liability insurance to EPEC and its executive officers, including but not limited to Amos Pollard, Charles Lambert, Rawlin Delaughter and Ray Brooks, that provided coverage for the causes of action asserted by plaintiff against EPEC. As such, The Travelers Insurance Company and/or Travelers Indemnity Company is liable for the damages alleged in the Original Petition and any supplement against EPEC and its executive officer, including but not limited to Amos Pollard, Charles Lambert, Rawlin Delaughter and Ray Brooks, individually, jointly and *in solido*.

111. Plaintiff avers that Employers Insurance Company of Wausau, f/k/a Employer's Mutual Liability Insurance Company of Wisconsin issued policies of comprehensive general liability insurance to Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington, that provided coverage for the causes of action asserted by plaintiffs against Equitable

Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington. As such, Employers Insurance Company of Wausau, f/k/a Employer's Mutual Liability Insurance Company of Wisconsin is liable for the damages alleged in the Original Petition and any supplement against Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington, individually, jointly and *in solido*.

112.   Plaintiff avers that Travelers Casualty & Surety Co., issued policies of comprehensive general liability insurance to Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington, that provided coverage for the causes of action asserted by plaintiffs against Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington. As such, Travelers Casualty & Surety Co. is liable for the damages alleged in the Original Petition and any supplement against Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington, individually, jointly and *in solido*.

113.   Plaintiff avers that The Travelers Indemnity Company issued policies of comprehensive general liability insurance to Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington, that provided coverage for the causes of action asserted by plaintiffs against Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington. As such, The Travelers Indemnity Company is liable for the damages alleged in the Original Petition and any supplement against Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and

its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington, individually, jointly and *in solido*.

114.   Plaintiff avers that Continental Insurance Company, f/k/a Fidelity Fire & Casualty Company, issued policies of comprehensive general liability insurance to Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington, that provided coverage for the causes of action asserted by plaintiffs against Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington.  As such, Continental Insurance Company, f/k/a Fidelity Fire & Casualty Company is liable for the damages alleged in the Original Petition and any supplement against Equitable Equipment Co., Inc., later known as Equitable Shipyard, Inc. and its executive officers, Cecil M. Keeney, Donald R. Chandler, John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Seruntine, Jr., Floyd Jenkins, and Courtney Pennington, individually, jointly and *in solido*.

## DAMAGES

115.   The conduct of Defendants, as alleged hereinabove, was a direct, proximate and producing cause of the damages resulting from the asbestos-related disease and other related physical conditions of Curtis D. Morgan as set forth in Exhibit "A".  Plaintiff has been damaged in the following non-exclusive particulars:

(a)   The continuing and conscious physical pain and suffering and mental anguish sustained by Curtis D. Morgan;

(b)   The continuing physical impairment suffered by Curtis D. Morgan;

(c)   The continuing disfigurement suffered by Curtis D. Morgan;

(d)   Reasonable and necessary medical expenses incurred by Curtis D. Morgan;

(e)   Curtis D. Morgan's lost earnings and net accumulations;

(f)   Curtis D. Morgan's mental anguish caused by his extraordinary increased likelihood during his lifetime of developing asbestos-related cancer of the lungs, mesothelioma and other cancers, due to said exposure to products manufactured, installed, maintained, sold and/or distributed by the named Defendants; and;

43

(g)    Curtis D. Morgan's loss of enjoyment of life.

112.    Plaintiff filed suit within one (1) year of the date of discovering Plaintiff's

asbestos-related conditions or the existence of any asbestos-related causes of action.

113.    Plaintiff requests trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment against the

Defendants, and each of them, jointly and severally, for general damages, special damages, for

his costs expended herein, for prejudgment interest from the date of Plaintiff's filing of the

lawsuit and post judgment interest on the judgment at the rate allowed by law, for trial by jury,

and for such other and further relief, both at law and in equity, to which Plaintiff may show

himself justly entitled.


                          Respectfully submitted,

                          **BARON & BUDD, P.C.**
                          2600 Citiplace Drive, Suite 400
                          Baton Rouge, LA 70808
                          Tel: (225) 927-5441
                          Fax: (225) 927-5449


                          J. Burton LeBlanc, IV (Bar Roll No. 20491)
                          David R. Cannella (Bar Roll No. 26231)
                          Christopher C. Colley (Bar Roll No. 30322)
                          Jeremiah S. Boling (Bar Roll No. 34249)
                          **ATTORNEYS FOR PLAINTIFFS**


FILED

2017 FEB 23 P 1:17

A TRUE COPY
DATE 2.23.2017.

Deputy Clerk, Ex-Officio, Recorder, Iberville Parish, Louisiana

## EXHIBIT "A"

Curtis D. Morgan:    Curtis D. Morgan
DOB: January 4, 1949
SSN: xxx-xx-6534

Disease:    Asbestos-related Mesothelioma

Work History:

| Employer Name | Trade | JobSiteName | City | State | Years |
|---|---|---|---|---|---|
| Avondale | Boilermaker/Welder | Avondale | Avondale | LA | 1966 |
| Nichols Construction | Boilermaker/Welder | | | LA | 1966-1967 |
| Hopeman Brothers | Boilermaker/Welder | | | LA | 1968 |
| Equitable Equipment Co | Boilermaker/Welder | | | LA | 1972-1973 |
| Riley Power | Boilermaker/Welder | | | LA | 1973-1974 |
| Boland Marine & Mfg Co | Boilermaker/Welder | | | LA | 1974 |
| Barnard Burk | Boilermaker/Welder | | | LA | 1974, 1976, 1980 |
| Delta Field Erection | Boilermaker/Welder | | | LA | 1974 |
| Bechtel Power Corp | Boilermaker/Welder | | | LA | 1974-1975 |
| Stone & Webster | Boilermaker/Welder | | | LA | 1975 |
| Catalytic | Boilermaker/Welder | | | LA | 1975 |
| National Maintenance | Boilermaker/Welder | | | LA | 1975-1977, 1982 |
| AMEC Plant Services | Boilermaker/Welder | | | LA | 1975, 1982-1983, 1985 |
| Jacobs Constructors | Boilermaker/Welder | | | LA | 1976-1978, 1980-1981 |
| Delta Maintenance | Boilermaker/Welder | | | LA | 1977, 1979 |
| MCC Group | Boilermaker/Welder | | | LA | 1977 |
| Combustion Engineering | Boilermaker/Welder | | | LA | 1978-1990 |
| FECO | Boilermaker/Welder | | | LA | 1979-1980 |
| Gulf Engineering Company | Boilermaker/Welder | | | LA | 1979-1989 |
| Forbes Construction | Boilermaker/Welder | | | LA | 1979 |
| Babcock & Wilcox | Boilermaker/Welder | | | LA | 1980-1981 |
| Lou-Con | Boilermaker/Welder | | | LA | 1980-1991 |
| Foster Wheeler | Boilermaker/Welder | | | LA | 1981 |
| CWCO | Boilermaker/Welder | | | LA | 1981 |
| Nadco, Inc. | Boilermaker/Welder | | | LA | 1981-1982 |
| International Maintenance | Boilermaker/Welder | | | LA | 1988 |
| Babcock & Wilcox Const. | Boilermaker/Welder | | | LA | 1988-1989 |
| Petro Engineering & Con. | Boilermaker/Welder | | | LA | 1989 |
| Loch Construction | Boilermaker/Welder | | | LA | 1991 |
| Midwest Industrial Contractors | Boilermaker/Welder | | | LA | 1991 |
| Fluor Maintenance Services | Boilermaker/Welder | | | LA | 2002 |
| Wainwright Construction | Boilermaker/Welder | | | LA | 2002 |
| Fluor Constructors | Boilermaker/Welder | | | LA | 2002 |
| | Boilermaker/Welder | Avondale | Avondale | LA | 1965-1985 |
| | Boilermaker/Welder | Air Products | New Orleans | LA | 1965-1985 |
| | Boilermaker/Welder | Hooker | Taft | LA | 1965-1985 |
| | Boilermaker/Welder | Crown Zellarbach | St. Francisville | LA | 1965-1985 |
| | Boilermaker/Welder | Michoud | New Orleans | LA | 1965-1985 |
| | Boilermaker/Welder | Little Gypsy | Laplace | LA | 1965-1985 |
| | Boilermaker/Welder | Good Hope | Norco | LA | 1965-1985 |
| | Boilermaker/Welder | Texaco | Geismar | LA | 1965-1985 |
| | Boilermaker/Welder | Exxon | Baton Rouge | LA | 1965-1985 |
| | Boilermaker/Welder | Nine Mile Power Plant | Westwego | LA | 1965-1985 |
| | Boilermaker/Welder | BASF | Geismar | LA | 1965-1985 |
| | Boilermaker/Welder | Shell | Geismar | LA | 1965-1985 |

| | Boilermaker/Welder | Dow Chemical | Plaquemine | LA | 1965-1985 |
|---|---|---|---|---|---|
| | Boilermaker/Welder | Ciba-Geigy | St. Gabriel | LA | 1965-1985 |
| | Boilermaker/Welder | Chevron | Belle Chasse | LA | 1965-1985 |
| | Boilermaker/Welder | Willow Glen | St. Gabriel | LA | 1965-1985 |
| | Boilermaker/Welder | Allied | Baton Rouge | LA | 1965-1985 |
| | Boilermaker/Welder | Waterford | Killona | LA | 1965-1985 |
| | Boilermaker/Welder | Tenneco | Chalmette | LA | 1965-1985 |
| | Boilermaker/Welder | Murphy Oil | Mereaux | LA | 1965-1985 |
| | Boilermaker/Welder | Shell | Norco | LA | 1965-1985 |
| | Boilermaker/Welder | Texaco | Convent | LA | 1965-1985 |
| | Boilermaker/Welder | Bogalusa Paper | Bogalusa | LA | 1965-1985 |
| | Boilermaker/Welder | American Cyanimid | Waggaman | LA | 1965-1985 |
| | Boilermaker/Welder | CF Industries | Donaldsonville | LA | 1965-1985 |
| | Boilermaker/Welder | Monsanto | Luling | LA | 1965-1985 |
| | Boilermaker/Welder | Kaiser | Gramercy | LA | 1965-1985 |

PLEASE SERVE THE FOLLOWING DEFENDANTS WITH A COPY OF PLAINTIFF'S
PETITION FOR DAMAGES, MOTION FOR LEAVE TO TAKE VIDEO-TAPED
DEPOSITION FOR DISCOVERY AND TO PERPETUATE TESTIMONY PRIOR TO
TRIAL, AND NOTICE OF VIDEO-TAPED DEPOSITION TO PERPETUATE
TESTIMONY PRIOR TO TRIAL:

1.  ALBERT BOSSIER, JR.
    Through his agent for service of process:
    Brian Bossier
    3421 North Causeway Blvd.
    Suite 900
    Metairie, La.  70002

2.  AMERICAN EMPLOYERS INSURANCE COMPANY
    Through the Louisiana Secretary of State:
    8549 United Plaza Boulevard
    Baton Rouge, LA 70809

3.  AMERICAN MOTORISTS INSURANCE COMPANY
    Through the Louisiana Secretary of State:
    8549 United Plaza Boulevard
    Baton Rouge, LA 70809

4.  ANCO INSULATIONS, INC
    Through its agent for service:
    Brent J. Bourgeois
    Roedel, Parsons, Koch, Blache, Balhoff & McCollister
    8440 Jefferson Highway, Suite 301
    Baton Rouge, LA 70809-7654

5.  BAYER CROPSCIENCE, INC. (SUCCESSOR TO          **LONG ARM SERVICE**
    RHONE POULENC AG COMPANY
    FORMERLY AMCHEM PRODUCTS, INC.
    FORMERLY BENJAMIN FOSTER COMPANY)
    (Via Louisiana Long Arm Statute)
    Through their agent for service of process:
    Corporation Service Company
    80 State Street
    Albany, New York  12207

6.  CBS CORPORATION                                **LONG ARM SERVICE**
    (F/K/A WESTINGHOUSE ELECTRIC CORPORATION)
    (Via the Louisiana Long Arm Statute):
    Corporation Service Company
    2711 Centerville Road, Suite 400
    Wilmington, DE 19808

7.  CBS CORPORATION                                **LONG ARM SERVICE**
    (F/K/A WESTINGHOUSE ELECTRIC CORPORATION)
    (Via the Louisiana Long Arm Statute):
    C/O CT CORPORATION SYSTEM
    116 Pine Street, Suite 320,
    Harrisburg, PA  17101

8.  ONEBEACON AMERICA INSURANCE COMPANY
    (as successor to Commercial Union Insurance Company and Employers Commercial
    Union Insurance Company)
    (For service of process via the Direct Action Statute, L.R.S. 22:655)
    Through the Louisiana Secretary of State:
    8585 Archives Avenue
    Baton Rouge, Louisiana 70809

47

9.  FOSTER WHEELER ENERGY CORPORATION
    Through its agent for service:
    CT Corporation System
    3867 Plaza Tower Dr.
    Baton Rouge, LA  70816

10. GENERAL ELECTRIC COMPANY
    Through its agent for service:
    CT Corporation System
    3867 Plaza Tower Dr.
    Baton Rouge, LA  70816

11. HOPEMAN BROTHERS, INC.                    **LONG ARM SERVICE**
    (Via Louisiana Long Arm Statute)
    AWAH Corporation
    435 Essex Ave., Suite 101
    Waynesboro, Virginia  22980

12. HUNTINGTON INGALLS INCORPORATED, f/k/a NORTHROP GRUMMAN
    SHIPBUILDING, INC., and f/k/a AVONDALE INDUSTRIES, INC., f/k/a AVONDALE
    SHIPYARDS, INC.
    Through its agent for service of process:
    CT Corporation System
    3867 Plaza Tower Dr.
    Baton Rouge, LA  70816

13. J. MELTON GARRETT                         **LONG ARM SERVICE**
    7909 Enclave Way
    Dallas, Texas  75218

14. THE MCCARTY CORPORATION
    (SUCCESSOR TO MCCARTY-BRANTON, INC.
    AND PREDECESSOR AND SUCCESSOR TO
    MCCARTY INSULATION SALES, INC.)
    Through its agent for service of process:
    Paul Spaht
    4232 Bluebonnet Blvd.
    Baton Rouge, LA 70809

15. REILLY-BENTON COMPANY, INC.
    Through its agent for service:
    Thomas L. Cougill
    Willingham, Fultz & Cougill, LLP
    8550 United Plaza Blvd., Ste. 702
    Baton Rouge, La 70809

16. RILEY POWER, INC.
    (f/k/a Babcock Borsig Power, Inc., f/k/a D.B. Riley, Inc., f/k/a Riley Stoker Corporation)
    Through its agent for service:
    C.T. Corporation System
    3867 Plaza Tower Dr.
    Baton Rouge, LA  70816

17. TAYLOR-SEIDENBACH, INC.
    Through its agent for service:
    Robert I. Shepard
    731 South Scott St.
    New Orleans, La 70119

18.   THE TRAVELERS INDEMNITY COMPANY, (individually and as insurer for The
      McCarty Corporation, and its Executive Officers, Marvin McCarty, deceased)
      (For service of process via the Direct Action Statute, L.R.S. 22:655)
      Through the Louisiana Secretary of State:
      8585 Archives Avenue
      Baton Rouge, Louisiana 70809

19.   UNION CARBIDE CORPORATION
      Through its agent for service:
      CT Corporation System
      3867 Plaza Tower Dr.
      Baton Rouge, LA 70816

20.   CBS CORPORATION                              **LONG ARM SERVICE**
      (F/K/A WESTINGHOUSE ELECTRIC CORPORATION)
      (Via the Louisiana Long Arm Statute):
      51 W. 52nd Street
      New York, NY 10019

21.   EAGLE, INC.
      (f/k/a Eagle Asbestos & Packing Co., Inc.)
      Through its agent for service:
      Susan B. Kohn
      Simon, Peragine, Smith & Redfearn
      Energy Center - 30th Floor
      1100 Poydras Street
      New Orleans, LA 70163-3000

24.   BAYER CROPSCIENCE, LP
      Through its agent for service:
      Corporation Service Company
      501 Louisiana Avenue
      Baton Rouge, LA 70802

25.   MONSANTO COMPANY
      Through its agent for service:
      Corporation Service Company
      501 Louisiana Avenue
      Baton Rouge, LA 70802

26.   CF INDUSTRIES NITROGEN, LLC
      Through its agent for service:
      Corporation Service Company
      501 Louisiana Avenue
      Baton Rouge, LA 70802

27.   WYETH HOLDINGS LLC
      Through its agent for service:
      CT Corporation System
      3867 Plaza Tower Dr.
      Baton Rouge, LA 70816

28.   SHELL OIL COMPANY
      Through its agent for service:
      CT Corporation System
      3867 Plaza Tower Dr.
      Baton Rouge, LA 70816

29.   SHELL CHEMICAL LP
      Through its agent for service:
      CT Corporation System
      3867 Plaza Tower Dr.
      Baton Rouge, LA 70816

30.  MURPHY OIL USA, INC.
     Through its agent for service:
     CT Corporation System
     3867 Plaza Tower Dr.
     Baton Rouge, LA 70816

31.  TENNESSEE GAS PIPELINE COMPANY, LLC
     (f/k/a Tenneco, Inc.)
     Through its agent for service:
     CT Corporation System
     3867 Plaza Tower Dr.
     Baton Rouge, LA 70816

32.  EPEC OIL COMPANY                           **LONG ARM SERVICE**
     (f/k/a Tenneco Oil Company)
     Pursuant to the Louisiana Long Arm Statute:
     1001 Louisiana Street
     Houston, TX 77002-5089

33.  EL PASO ENERGY E.S.T. COMPANY              **LONG ARM SERVICE**
     (Trustee for the EPEC Oil Company f/k/a Tenneco Oil Company)
     Pursuant to the Louisiana Long Arm Statute:
     1001 Louisiana Street
     Houston, TX 77002-5089

34.  ENTERGY CORPORATION
     Through its agent for service:
     Marcus V. Brown
     639 Loyola Avenue
     26TH Floor
     New Orleans, LA 70113

35.  ENTERGY LOUISIANA, LLC
     Through its agent for service:
     John A. Braymer
     639 Loyola Avenue
     26TH Floor
     New Orleans, LA 70113

36.  ENTERGY NEW ORLEANS, INC., (individually and f/k/a NEW ORLEANS PUBLIC
     SERVICE, INC.)
     Through its agent for service:
     Marcus V. Brown
     639 Loyola Avenue
     26TH Floor
     New Orleans, LA 70113

37.  LIBERTY MUTUAL INSURANCE COMPANY
     (individually and as insurer for Wayne Manufacturing and/or Hopeman Brothers and
     their executive officers)
     (For service of process via the Direct Action Statute, L.R.S. 22:655)
     Through the Louisiana Secretary of State:
     8585 Archives Avenue
     Baton Rouge, Louisiana 70809

38.  THE TRAVELERS INDEMNITY COMPANY, individually and as insurer for EPEC
     Oil, f/k/a Tenneco Oil Company, and its executive officers
     (For Service of Process via the Direct Action Statute L.R.S. 22:655)
     Through the Louisiana Secretary of State:
     8585 Archives Avenue
     Baton Rouge, Louisiana 70809

39.   THE TRAVELERS INSURANCE COMPANY, individually and as insurer for EPEC
      Oil, f/k/a Tenneco Oil Company, and its executive officers
      (For Service of Process via the Direct Action Statute L.R.S. 22:655)
      Through the Louisiana Secretary of State:
      8585 Archives Avenue
      Baton Rouge, Louisiana 70809

40.   AMOS G. POLLARD
      100 Christwood Blvd., #470
      Covington, LA 70433

41.   CHARLES LAMBERT
      13035 Calais Street
      New Orleans, LA 70129

42.   RAWLIN DELAUGHTER
      2032 Old River Road
      Slidell, LA 70461

43.   RAY BROOKS
      6123 Hagerstown Drive
      Baton Rouge, LA

44.   CHEVRON U.S.A., INC. (f/k/a Chevron Oil Company f/k/a California Oil Company,
      successor-by-merger to Standard Oil Company of Texas and successor-in-interest to Gulf
      Oil Corporation)
      Through its agent for service:
      The Prentice-Hall Corporation System
      501 Louisiana Avenue
      Baton Rouge, LA 70802

45.   HUNTSMAN PETROCHEMICAL CORPORATION, individually and f/k/a Huntsman
      Corporation and f/k/a Texaco Chemical Company
      Through its agent for service:
      Corporation Service Company
      501 Louisiana Avenue
      Baton Rouge, LA 70802

46.   TEXACO GROUP, LLC
      Through its agent for service:
      The Prentice-Hall Corporation System
      501 Louisiana Avenue
      Baton Rouge, LA 70802

47.   TEXACO, INC.                              **LONG ARM SERVICE**
      Pursuant to the Louisiana Long Arm Statute:
      6001 Bollinger Canyon Road
      San Ramon, CA 94583

48.   HONEYWELL INTERNATIONAL, INC., successor-in-interest to Allied-Signal, Inc.,
      successor by merger to Allied Corporation, f/k/a Allied Chemical Corporation, and Allied
      Chemical & Dye Corporation
      Through its agent for service:
      Corporation Service Company
      501 Louisiana Avenue
      Baton Rouge, LA 70802

49.   CHEVRON ORONITE COMPANY, LLC
      Through its agent for service:
      Corporation Service Company
      501 Louisiana Avenue
      Baton Rouge, LA 70802

50.    BASF CORPORATION
       (f/k/a Inmont Corporation, f/k/a BASF Wyandotte Corporation, f/k/a Wyandotte
       Chemicals Corporation)
       Through its agent for service:
       CT Corporation System
       3867 Plaza Tower Dr.
       Baton Rouge, LA  70816

51.    EXXON MOBIL CORPORATION
       (f/k/a Exxon Corporation, Standard Oil Corporation (New Jersey) and Standard Oil
       Company of New Jersey, individually, d/b/a Exxon Company, U.S.A., Exxon Chemical
       Company, and ExxonMobil Refining & Supply Company and as successor-in-interest to
       Humble Oil Company)
       Through its agent for service:
       Corporation Service Company
       501 Louisiana Avenue
       Baton Rouge, LA 70802

52.    TRANSAMERICAN NATURAL GAS CORPORATION        **LONG ARM SERVICE**
       (f/k/a GHR Energy Corp., f/k/a Good Hope Refineries, Inc.)
       Pursuant to the Louisiana Long Arm Statute:
       333 North Sam Houston Parkway East
       Suite 250
       Houston, TX 77060

53.    PHARMACIA CORPORATION
       (f/k/a Monsanto Company, f/k/a Monsanto Chemical Company)
       Through its agent for service:
       CT Corporation System
       3867 Plaza Tower Dr.
       Baton Rouge, LA  70816

54.    GEORGIA-PACIFIC, LLC
       (f/k/a Georgia-Pacific Corporation, individually and as successor-in-interest to Bestwall
       Gypsum Company)
       Through its agent for service:
       CT Corporation System
       3867 Plaza Tower Dr.
       Baton Rouge, LA  70816

55.    GEORGIA-PACIFIC CONSUMER OPERATIONS, LLC
       Through its agent for service:
       CT Corporation System
       3867 Plaza Tower Dr.
       Baton Rouge, LA  70816

56.    JACOBS CONSTRUCTORS, INC.                    **LONG ARM SERVICE**
       (f/k/a Jacobs/Wise Constructors, Inc. f/k/a H.E. Weise, Inc., individually and as
       successor-in-interest to Jacobs Constructors of California, Inc.)
       Pursuant to the Louisiana Long Arm Statute:
       1111 S. Arroyo Parkway
       Pasadena, CA 91105

57.    TURNER INDUSTRIES GROUP, LLC
       (f/k/a Turner Industries Holding Company, LLC., f/k/a Nichols Construction Company,
       LLC., f/k/a Nichols Construction Corporation)
       Through its agent for service:
       John H. Fenner, III or Max C. Marx
       8687 United Plaza Blvd.
       Baton Rouge, LA 70809

58. **AEROJET - GENERAL CORPORATION**    **LONG ARM SERVICE**
Pursuant to the Louisiana Long Arm Statute:
175 Ghent Road
Fairlawn, OH 44313

59. **AEROJET - GENERAL CORPORATION**    **LONG ARM SERVICE**
Pursuant to the Louisiana Long Arm Statute:
Highway 50 & Aerojet Road
Rancho Cordova, CA 95670

60. **BARNARD AND BURK, INC.**    **LONG ARM SERVICE**
(a/k/a Abard Corp., f/k/a Barnard & Burk Industrial Corp.)
Pursuant to the Louisiana Long Arm Statute:
1940 Alabama Avenue
Rancho Cordova, CA 95741

61. SYNGENTA CROP PROTECTION, individually and as successor-in-interest to
Novartis Crop Protection, Inc., successor-in-interest to Ciba Geigy Corporation
Through its agent for service:
C.T. Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

62. THE DOW CHEMICAL COMPANY
Through its agent for service:
C.T. Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

63. BECHTEL CORPORATION
(as successor-in-merger to Bechtel Civil, Inc., f/k/a Bechtel Civil & Minerals, Inc., f/k/a
Bechtel Petroleum, Inc., f/k/a Bechtel, Inc., and individually and as successor-in-interest
to Sequoia Ventures, Inc.)
Through its agent for service:
C.T. Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

64. BECHTEL POWER CORPORATION
Through its agent for service:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, LA 70816

65. AIR PRODUCTS AND CHEMICALS, INC.
Through its agent for service:
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

66. OCCIDENTAL CHEMICAL CORPORATION
Through its agent for service:
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

67.  The Liability Insurers of the Following Executive Officers of Equitable Equipment Co.,
     Inc., later known as Equitable Shipyard, Inc.: Cecil M. Keeney, Donald R. Chandler,
     John R. Tipton, Steve Davis, Fred Martin, John Pennington, Charles O. Scruntine, Jr.,
     Floyd Jenkins, Courtney Pennington (via Service of press via the Direct Action Statute
     La. R. S. 22: 1269)

   A.   **Employers Insurance Company of Wausau, f/k/a Employer's Mutual
        Liability Insurance Company of Wisconsin**
        through the Secretary of State for the State of Louisiana
        8585 Archives Avenue
        Baton Rouge, Louisiana 70809

   B.   **Travelers Casualty & Surety Co.**
        through the Secretary of State for the State of Louisiana
        8585 Archives Avenue
        Baton Rouge, Louisiana 70809

   C.   **The Travelers Indemnity Company**
        through the Secretary of State for the State of Louisiana
        8585 Archives Avenue
        Baton Rouge, Louisiana 70809

   D.   **Continental Insurance Company, f/k/a Fidelity Fire & Casualty Company**
        through the Secretary of State for the State of Louisiana
        8585 Archives Avenue
        Baton Rouge, Louisiana 70809

18TH JUDICIAL DISTRICT COURT FOR THE PARISH OF IBERVILLE

STATE OF LOUISIANA

DOCKET NO.                                                    DIV. "    "

CURTIS D. MORGAN

VERSUS

DOW CHEMICAL COMPANY, ET AL

FILED: _____        _____

                                        DEPUTY CLERK

## MOTION AND INCORPORATED MEMORANDUM TO REQUEST AN EXPEDITED TRIAL SETTING

NOW INTO COURT, through undersigned counsel, comes Plaintiff, **CURTIS D. MORGAN**, who respectfully moves this Honorable Court to set her case for trial on an expedited basis in accordance with Louisiana Code of Civil Procedure article 1573. Plaintiff, **CURTIS D. MORGAN**, has been diagnosed with a fatal asbestos-related disease.

1.

Plaintiff, **CURTIS D. MORGAN**, was born on January 4, 1949, and is presently sixty-eight (68) years old.

2.

Plaintiff, **CURTIS D. MORGAN**, was diagnosed with malignant mesothelioma on or about December 21, 2016, by doctors at Ochsner Medical Center in New Orleans, LA. (See Exhibit "A" attached.)

3.

Since the time Plaintiff has been diagnosed with malignant mesothelioma, he has been informed that her condition is deteriorating rapidly and that he is not expected to live much longer. While it is not known how much longer petitioner has to live, it is expected that he will not live in excess of six (6) months.

4.

Mr. Morgan's video-taped perpetuation deposition has already been noticed in an effort to expedite this matter.

WHEREFORE, Plaintiff requests that this case be set for trial on an expedited basis for the reasons mentioned above.

Respectfully submitted,

**BARON & BUDD, P.C.**
2600 CitiPlace Drive
Suite 400
Baton Rouge, LA 70808
Tel: (225) 927-5441
Fax: (225) 927-5449

By: _____

    J. Burton LeBlanc, IV (Bar Roll No. 20491)
    David R. Cannella (Bar Roll No. 26231)
    Christopher C. Colley (Bar Roll No. 30322)
    Jeremiah S. Boling (Bar Roll No. 34249)
    **ATTORNEYS FOR PLAINTIFFS**

FILED

2017 FEB 23 P 1:

2

18TH JUDICIAL DISTRICT COURT FOR THE PARISH OF IBERVILLE

STATE OF LOUISIANA

DOCKET NO.                                                DIV. "      "

CURTIS D. MORGAN

VERSUS

DOW CHEMICAL COMPANY, ET AL

FILED: _____        _____

                                            DEPUTY CLERK

<u>RULE TO SHOW CAUSE</u>

IT IS HEREBY ORDERED that defendants appear and show cause on the day of _____ 2017, at _____ o'clock _____.m. if they can as to why Plaintiff's request for an expedited trial setting should not be granted.

_____, Louisiana this the _____ day of _____, 2017.

                                    _____
                                            JUDGE

<u>PLEASE SERVE WITH</u>
<u>ORIGINAL PETITION</u>

3


**Ochsner**
Pathology and Laboratory Medicine

OCHSNER MEDICAL CENTER – NEW ORLEANS
PATHOLOGY & LABORATORY MEDICINE WILLIAM G. HELIS MEMORIAL LABORATORIES
1514 JEFFERSON HIGHWAY – NEW ORLEANS, LA 70121
Ph: (504) 842-3330 Fax: (504) 842-3684

## PATHOLOGY REPORT

| Patient Name | MORGAN, CURTIS D | Accession # | BS16-06795 |
|---|---|---|---|

| Medical Record # | 2097869 | | Billing # | EI0074511547 |
|---|---|---|---|---|
| Date of Birth | 1/4/1949 | (67Y M) | Collection Date | 12/14/2016 |
| Location | BRMH Telemetry | | Received | 12/15/2016 |
| | | | Reported | 12/21/2016 |

ORDERING PHYSICIAN(S)
JONES, KEA

CLINICAL DIAGNOSIS/INFORMATION

jm
PreOperative Diagnosis
Left pleural mass.

SPECIMEN
1) Left lung biopsy.

FINAL PATHOLOGIC DIAGNOSIS                                                                OMCBR
Left lung biopsy:
Mesothelioma.

Note: Immunostaining for CK7 and calretinin are strongly positive, while TTF-1 is negative. WT-1 shows weak
focal positivity. All stains with satisfactory control material. Case reviewed by Dr. Rebecca Phillips and Dr. Shams
Halat who concur. Message left for Dr. Stephen Adjei on 12/21/2016 at 8:00 am.

Diagnosed by: Jeremy Spencer M.D.
(Electronically Signed: 2016-12-21 14:45:07)

Microscopic Examination
This tissue demonstrates malignant nests of cells infiltrating a dense fibrous stroma.

Gross Description                                                                        OMCBR
ID/AP Label: 209-7869

The specimen is received in formalin and consists of 3 pale tan surgical fragments of tissue each measuring
approximately 1.17 m in length by 0.1 cm in diameter. The specimen is submitted entirely in one cassette.

Jeremy Spencer M.D.


PLAINTIFF'S
EXHIBIT
A

Report continued on next page                                          Page 1 of 2

| Patient Name | MORGAN, CURTIS D | | Accession # | BS16-06795 |
|---|---|---|---|---|
| Medical Record #<br>Date of Birth<br>Location | 2097869<br>1/4/1949      (67Y M)<br>BRMH Telemetry | | Billing #<br>Collection Date<br>Received<br>Reported | EI0074511547<br>12/14/2016<br>12/15/2016<br>12/21/2016 |

## Report Footnotes

OMCBR: Oohsner Medical Center Baton Rouge 17000 Medical Center Drive Baton Rouge LA 70816 (225) 755-4824 CLIA:

Page 2 of 2